[No. S011273. Mar. 6, 1995.]

In re DAVID JOSEPH CARPENTER on Habeas Corpus.

**COUNSEL**

Fern M. Laethem, State Public Defender, Sarah Plotkin, Chief Assistant State Public Defender, Kent Barkhurst, Douglas G. Ward and Thomas A. Schaaf, Deputy State Public Defenders, for Petitioner.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett Beaumont, M. Howard Wayne, Pat Zaharopoulos and Carl H. Horst, Deputy Attorneys General, for Respondent.

**OPINION**

**ARABIAN, J.**—The Director of Corrections appeals a superior court judgment and order on habeas corpus vacating an earlier superior court judgment against David Joseph Carpenter, including a sentence of death. We reverse.

## I. THE BACKGROUND

### A. *The Santa Cruz "Trailside Murder" Case*

In the Santa Cruz Superior Court, the People charged Carpenter with the following offenses committed in that county in the spring of 1981: (1) the murder of Ellen Marie Hansen under special circumstances of rape murder, lying in wait, and multiple murder; (2) the attempted rape of Hansen; (3) the attempted murder of Steven Russell Haertle with personal use of a firearm and infliction of great bodily injury; (4) the murder of Heather Scaggs under special circumstances of rape murder and multiple murder; and (5) the rape of Scaggs. Carpenter pleaded not guilty.

Following a change of venue because of pretrial publicity, a jury trial was held in Los Angeles County. The jury found Carpenter guilty on all charges, with the murders in the first degree, and found each of the allegations true. After the penalty phase, it returned a verdict of death, and the superior court imposed that sentence. Carpenter's automatic appeal to this court is pending.

### B. *The Marin "Trailside Murder" Case*

In a separate action, the one underlying this appeal, the People charged Carpenter with the following offenses committed in Marin County in the fall of 1980: (1) the murder of Cynthia Toshiko Moreland with personal use of a firearm; (2) the murder of Richard Edward Stowers with personal use of a

firearm; (3) the murder of Anne Evelyn Alderson under the special circumstance of rape murder and with personal use of a firearm; (4) the rape of Alderson with personal use of a firearm; (5) the murder of Diane Marie O'Connell under the special circumstance of rape murder and with personal use of a firearm; (6) the attempted rape of O'Connell with personal use of a firearm; (7) the murder of Shauna Catherine May under the special circumstance of rape murder and with personal use of a firearm; and (8) the rape of May with personal use of a firearm. The special circumstance of multiple murder was also charged. Carpenter pleaded not guilty.

After the trial for the Santa Cruz crimes, and following a change of venue because of pretrial publicity, jury trial in this case commenced in San Diego Superior Court. Prior to trial, the court ruled on the admissibility of evidence of the Santa Cruz "Trailside Murders." Both parties theorized that the same person committed both sets of crimes; the issue at trial was whether that person was Carpenter. For the guilt phase, the court permitted evidence of the facts underlying these offenses except those against Scaggs; it excluded the latter as, inter alia, substantially more prejudicial than probative under Evidence Code section 352. For the penalty phase, it permitted evidence of the facts underlying all the offenses. For both phases, it barred evidence of Carpenter's convictions and death sentences as substantially more prejudicial than probative.

Throughout jury selection and trial, the court continually admonished the prospective jurors and then jury, in accordance with Penal Code section 1122, that "it [was] their duty not to converse among themselves or with anyone else on any subject connected with the trial, or to form or express any opinion thereon until the cause [was] finally submitted to them," and to avoid publicity relating to the case. It admonished them to immediately advise any person attempting to discuss the case with them that they could not do so, and to immediately report the matter if such person should persist.

Barbara Durham was selected as one of the 12 jurors, and became the foreperson. On voir dire, she stated that she had not heard of the "Trailside Murders." She and the other 11 jurors evidently swore, in conformity with the oath prescribed by statute, that she would "well and truly try" the cause and "a true verdict render according to the evidence." (Code Civ. Proc., former § 604, enacted 1872, repealed Stats. 1988, ch. 1245, § 7, p. 4155; accord, id., § 232, subd. (b).)

During the guilt phase, evidence of the facts underlying the Santa Cruz crimes, except the Scaggs offenses, featured prominently, but evidence of the verdicts was not presented. The jury found Carpenter guilty on all

charges, with the murders in the first degree, and found each of the allegations true. During the penalty phase, evidence of the facts underlying the Santa Cruz crimes, including the Scaggs offenses, but not the verdicts, was introduced. The jury returned a verdict of death, and the superior court imposed that sentence. Carpenter's automatic appeal is pending in this court.

## II. THE HABEAS CORPUS PROCEEDING

Carpenter filed a petition for writ of habeas corpus in the San Diego Superior Court challenging the judgment in the Marin "Trailside Murder" case shortly after its rendition. He alleged that Juror Durham had committed prejudicial misconduct during trial. The matter was assigned to the trial judge, who issued an order to show cause why relief should not be granted. After a return—which challenged the jurisdiction of the superior court and denied the allegations of misconduct—and traverse were filed, the court ordered an evidentiary hearing. Carpenter presented extensive evidence, mainly through the testimony of Michael Lustig and Donna Duran. The respondent also presented extensive evidence, mainly through Juror Durham and her husband Ronald.

The court characterized the evidentiary hearing as a "classic credibility contest" between Lustig and Duran on one side, and the Durhams on the other. It found Lustig's testimony "credible . . . in almost all respects," and Duran's credible in all respects. It doubted the testimony of the Durhams, and found that of Juror Durham, in its general denial of misconduct, perjurious.

From all the evidence, the court determined that Juror Durham had committed misconduct by receiving information outside of court relating to the convictions and death sentence for the Santa Cruz crimes. By March 26, 1988, in the middle of the guilt phase, she had received the forbidden information from newspaper accounts, either directly or through her husband. Until at least March 26, 1988, the couple received delivery of a newspaper at their home. They had falsely stated in their original declarations that they had canceled their subscription around the opening of the guilt phase. Instead, they ordered cancellation on, or as of, March 26, 1988. At all relevant times, they were experiencing drinking problems and marital troubles. Ronald openly criticized the trial as a waste of time and money, having learned that Carpenter had already been convicted and sentenced to death for the Santa Cruz crimes. The "situation" was "very explosive," presenting an "opportunity for a verbal battle between husband and wife while parties have been drinking." "[O]n many occasions he apparently told her when she would come home from this trial, . . . 'I know so much more

about this case than you do.' [¶] . . . I don't know what would provoke that kind of response unless Mrs. Durham is somehow talking about aspects of the case." He had the "opportunity . . . to let his wife know in no uncertain terms that you're just wasting your time on this trial because Mr. Carpenter has already got the death sentence and he's been convicted of similar crimes."

The superior court also found that Juror Durham had committed misconduct by discussing the case pending before her and Carpenter's Santa Cruz convictions and death sentence with nonjurors, including Lustig and Duran. On March 26, 1988, Lustig, Duran and others were having dinner at a resort in San Diego County. Lustig invited the Durhams, who were social acquaintances but not close friends, to his table. At Lustig's table, Juror Durham initiated a five- or ten-minute conversation about the Marin case. She stated something like the jury was not supposed to know this, but Carpenter had already been convicted and sentenced to death for the Santa Cruz crimes. The court found Juror Durham to be "very outspoken," and to have "no hesitancy talking about her marital problems" even "with a virtual stranger . . . . And . . . that's somewhat similar to the fact that she would share with a stranger her confidential information about this case." "[S]he wanted to be the center of attention that night, and that kind of disclosure placed her in the center of attention with the Lustig[]" party. She admitted she had discussed the Marin case with Lustig and Duran, but denied revealing that she knew the forbidden information and knew it was forbidden. The court did not credit this.

Having found misconduct, the court ordered a separate hearing on prejudice. At that hearing, the parties presented extensive argument but did not introduce new evidence. In a detailed ruling, the court found prejudice. It stated at the outset that it was applying the analysis of *People* v. *Martinez* (1978) 82 Cal.App.3d 1 [147 Cal.Rptr. 208], which held that whether a defendant has been prejudiced by a jury receiving evidence outside of court "depends upon whether the jury's impartiality has been adversely affected, whether the prosecution's burden of proof has been lightened and whether any asserted defense has been contradicted." (*Id.* at p. 22.) The court analyzed prejudice at the penalty phase first, then at the guilt phase.

Regarding penalty, the court analogized the receipt of the information to error under *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633], which, the trial court stated, "held that it's constitutionally impermissible to rest a death sentence on a determination made by a juror who has been led to believe that the responsibility for the defendant's death rests elsewhere [than] in that juror's determination." The court found that the

juror's knowledge of the other death sentence "would serve to minimize her sense of responsibility in making the difficult and uncomfortable penalty determination," and that therefore she "would have her impartiality compromised against the defendant by knowing that another jury of 12 has concluded that he is a person worthy of the death sentence and that would affect her decision." The court found that the prosecution's burden had been lightened because "there's no way that she could have given that the same kind of consideration knowing on one hand that the defendant already had been sentenced to death by another jury." Because of this, the court found that the prosecution had not rebutted the presumption of prejudice.

The court then turned to the guilt phase. It stated that the evidence of guilt was "overwhelming," but that because the defendant was entitled to trial by an unbiased jury, the "usual harmless error tests" did not apply. Therefore, "with respect to the guilt phase, to rebut the presumption of prejudice the People must show that Mrs. Durham remained impartial despite her knowledge of appellant's other convictions for similar crimes and death sentence, and also, as the *Martinez* test states, the prosecution's burden of proof was not lightened, and that no assertive defenses had been contradicted. That is a factual situation, and the likelihood of the same verdict despite the misconduct is of no consequence." The court could not find "that the misconduct . . . and the information she received was innocuous or of a trivial nature. I would find that the extrajudicial information that caused her misconduct was inherently prejudicial." "[T]he nature of the information was such that the juror's impartiality could not be anything but adversely affected." The fact the juror knew that defendant "was the kind of person that 12 other people . . . chose to sentence to death . . . could not but affect her determination of whether or not she could remain a fair and impartial juror as to this case and in evaluating the evidence and also his own testimony. So I definitely believe it affects her impartiality."

The court estimated that about two-thirds of the guilt phase evidence was directed to proving the Santa Cruz County crimes, and one-third to proving the Marin County crimes. It felt the improper knowledge was "highly prejudicial" and lightened the prosecution's burden because of the "unique aspect of the case" that "it was conceded by the defense and argued by the prosecution that one person committed both the Santa Cruz and the Marin murders." For the same reason, the court found that the juror's knowledge undermined the defense that defendant "was not the trailside killer." The court noted that it had done everything it could to keep the jury from learning of the earlier verdict. "And despite everything that was done by way of evidentiary rulings and the like, this is exactly the information that Mrs. Durham had."

For these reasons, the court "reluctantly" stated it had "no alternative than to grant the petition for writ of habeas corpus in its entirety . . . ." It further stated that "because of the gravity of the crimes themselves . . . I would find beyond a reasonable doubt that any jury would have sentenced the defendant to the death penalty based upon the evidence presented and would also find that the evidence was so overwhelming with respect to defendant's guilt that if . . . you could apply the harmless error standard to juror misconduct, I would find that her knowledge would be harmless beyond a reasonable doubt because of the overwhelming nature of the evidence in this case and as well as the overwhelming proof of the gravity of the aggravating circumstances in the penalty phase so completely outweighed and dominated the mitigation factors that the jury would make that result." Because of this, the court felt that it was "an absolute travesty that such a result could happen to such a case." The court also stated its intent ·to inform the San Diego District Attorney and the Attorney General of the situation and its belief that "the matter should be reviewed for possible prosecution under Penal Code section 96 [stating the punishment for specified jury misconduct]."

The superior court then granted the petition for writ of habeas corpus and vacated the judgment. The Director of Corrections appealed directly to this court. (Pen. Code, § 1506.)

### III. DISCUSSION

The Attorney General, representing the Director of Corrections, challenges both the jurisdiction of the superior court over this matter and its ruling on the merits. We address both contentions.

### A. *Subject Matter Jurisdiction*

■ The Attorney General first argues the superior court did not have subject matter jurisdiction over the habeas corpus proceeding challenging the Marin "Trailside Murder" judgment because the automatic appeal from the same judgment is pending in this court. We disagree.

Section 10 of article VI of the California Constitution (hereafter article VI, section 10) provides in pertinent part: "The Supreme Court, courts of appeal, superior courts, and their judges have original jurisdiction in habeas corpus proceedings." This provision grants original subject matter jurisdiction over habeas corpus proceedings concurrently to the superior court, the Court of Appeal, and this court. (E.g., *France* v. *Superior Court* (1927) 201 Cal. 122, 131 [255 P. 815, 52 A.L.R. 869] [decided under former §§ 4 & 5 of art. VI of Cal. Const., which were the substantially similar predecessors of present

art. VI, § 10]; *People* v. *Mayfield* (1993) 5 Cal.4th 220, 224-225 [following *France* under present art. VI, § 10].)

Nothing in article VI, section 10, or any other provision of law, denies the superior court of subject matter jurisdiction over habeas corpus proceedings when the challenged judgment is pending on appeal before an appellate court or even when, as here, a judgment of death is pending on automatic appeal before this court. None of the authorities the Attorney General cites holds to the contrary. As to his policy arguments, the superior court's original, concurrent subject matter jurisdiction over habeas corpus proceedings is a "policy" declared in the California Constitution. It must be implemented by the judiciary. We agree with the Attorney General that "[c]apital cases are different." They are exclusively within our appellate jurisdiction. (Cal. Const., art. VI, § 11.) But they are not exclusively within our *habeas corpus* jurisdiction. To the extent that the Attorney General quarrels with the superior court's determination that its exercise of subject matter jurisdiction was appropriate in view of "the interests of justice, judicial economy, and the avoidance of potentially prejudicial delay to both parties," we also disagree.

This is not to say that the superior court may exercise its subject matter jurisdiction over habeas corpus proceedings wherever such jurisdiction extends. It does not have "the power to interfere with the appellate jurisdiction of either [this court or the Court of Appeal] in matters pending before said appellate courts . . . ." (*France* v. *Superior Court, supra,* 201 Cal. at p. 132; accord, *People* v. *Mayfield, supra,* 5 Cal.4th at p. 225.) There was no such interference here. On habeas corpus, the superior court entertained only the claim of juror misconduct *that did not appear of record.* In the exercise of our appellate jurisdiction, we could not consider that point. Appellate jurisdiction is limited to the four corners of the record on appeal (e.g., *People* v. *Merriam* (1967) 66 Cal.2d 390, 396-397 [58 Cal.Rptr. 1, 426 P.2d 161], disapproved on another point, *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 882 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845])—which, in this case, does not include the evidence of misconduct. We thus conclude the superior court had jurisdiction over this matter.

B. *Prejudicial Juror Misconduct*

The Attorney General does not challenge, and we accept, the superior court's findings of historical fact, which resolved a credibility dispute. ▮ The power to judge the credibility of witnesses and to resolve conflicts in the testimony is vested in the trial court, and its findings of fact, express or implied, must be upheld if supported by substantial evidence. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].) Here the court expressly resolved the conflicts in the testimony in Carpenter's favor, and we find substantial evidence supports these factual findings.

In essence, during the trial, the juror in question learned forbidden information but did not report it, then told some nonjurors at a party that the jurors were not supposed to know, but Carpenter had already been convicted and sentenced to death for the Santa Cruz crimes, and then lied about it when confronted after trial. The Attorney General also does not deny that these facts establish misconduct. They clearly do. It is improper for a juror to receive information outside of court about the pending case, and to discuss the case with nonjurors. (E.g., *In re Hitchings* (1993) 6 Cal.4th 97, 116-118 [24 Cal.Rptr.2d 74, 860 P.2d 466]; *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1108 [269 Cal.Rptr. 530, 790 P.2d 1327].) But he argues the court erred in its finding that the misconduct was prejudicial. We agree.

In considering this question, we first review the applicable law, then apply it to this case.

### 1. *The Applicable Law*

Carpenter relies heavily on a trio of recent decisions by this court which state the test for determining prejudice from juror misconduct. (*In re Hitchings, supra,* 6 Cal.4th 97; *People* v. *Holloway, supra,* 50 Cal.3d 1098; *People* v. *Marshall* (1990) 50 Cal.3d 907 [269 Cal.Rptr. 269, 790 P.2d 676].) We will address these and other California cases in due course, but we begin by discussing some decisions of the United States Supreme Court that will help place this issue into context, and point the way to the proper application of the test we have established.

The first, *Smith* v. *Phillips* (1982) 455 U.S. 209 [71 L.Ed.2d 78, 102 S.Ct. 940], involved facts that in some respects are more troubling than those here. The defendant was convicted by jury of crimes in state court. During the trial, one of the actual jurors applied "for employment as a major felony investigator in the District Attorney's Office." (*Id.* at p. 212 [71 L.Ed.2d at p. 83].) When the defendant learned of this after trial, he unsuccessfully moved to set aside the verdict. The trial court found that the employment application " 'was indeed an indiscretion,' " but it did not indicate prejudice against the defendant or an inability to decide guilt or innocence " 'solely on the evidence.' " (*Id.* at pp. 213-214 [71 L.Ed.2d at p. 84].)

The high court found no constitutional infirmity in the verdict despite the obvious inherent motivation the job applicant may have had to reach a verdict favorable to the prospective employer. It rejected the argument that "the law must impute bias to jurors" in that position, stating that the "Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove *actual* bias." (*Smith* v. *Phillips, supra,* 455 U.S. at p. 215 [71 L.Ed.2d at p. 85], italics added.) The court reviewed prior decisions and concluded that they "demonstrate that due process does not require a new trial every time a juror has been placed

in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; *it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.* Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." (*Id.* at p. 217 [71 L.Ed.2d at p. 86], italics added.)

In *Rushen* v. *Spain* (1983) 464 U.S. 114 [78 L.Ed.2d 267, 104 S.Ct. 453], the court considered the effect on a verdict of improper ex parte communications between the trial court and jurors during a lengthy trial. It took a similarly pragmatic approach. "Our cases recognize that the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant. [Fn. omitted.] 'At the same time and without detracting from the fundamental importance of [these rights], we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice. Cases involving [such constitutional] deprivations are [therefore] subject to the general rule that remedies should be tailored to the injury suffered . . . and should not unnecessarily infringe on competing interests.' [Citations.]" (*Id.* at pp. 117-118 [78 L.Ed.2d at pp. 272-273].)

The high court stated, "There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The . . . conclusion that an unrecorded *ex parte* communication between trial judge and juror can never be harmless error *ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice.*" (*Rushen* v. *Spain, supra,* 464 U.S. at pp. 118-119 [78 L.Ed.2d at p. 273], quoted with approval in *People* v. *Wright* (1990) 52 Cal.3d 367, 402-403 [276 Cal.Rptr. 731, 802 P.2d 221], italics added.) As an example, the court noted that "we have refused, on facts more troublesome than these, to find inherent bias in a verdict when a state trial court determined 'beyond a reasonable doubt' that a juror's out-of-court action did not influence the verdict." (*Rushen* v. *Spain, supra,* 464 U.S. at p. 119, fn. 3 [78 L.Ed.2d at p. 273], citing *Smith* v. *Phillips, supra,* 455 U.S. 209.)

*McDonough Power Equipment, Inc.* v. *Greenwood* (1984) 464 U.S. 548 [78 L.Ed.2d 663, 104 S.Ct. 845] involved a juror who failed to disclose certain information during voir dire. In holding that a new trial is not required "unless the juror's failure to disclose denied respondents their right

to an impartial jury" (*id.* at p. 549 [78 L.Ed.2d at p. 667]), the high court noted, "Trials are costly, not only for the parties, but also for the jurors performing their civic duty and for society which pays the judges and support personnel who manage the trials. It seems doubtful that our judicial system would have the resources to provide litigants with perfect trials, were they possible, and still keep abreast of its constantly increasing caseload." (*Id.* at p. 553 [78 L.Ed.2d at p. 669].)[1]

A decision last term, *Romano v. Oklahoma* (1994) 512 U.S. __ [129 L.Ed.2d 1, 114 S.Ct. 2004], is significant given the trial court's characterization of the misconduct here as error under *Caldwell v. Mississippi, supra,* 472 U.S. 320. In *Romano,* the petitioner, like Carpenter, was charged and tried separately for separate capital offenses. In the first trial, the jury found the petitioner guilty of murder and sentenced him to death. A different jury then convicted him of a second murder and also sentenced him to death. During the sentencing phase of the second trial, evidence of the first murder was presented. Additionally, *evidence of the first conviction and death sentence* was also presented to the jury—erroneously but harmlessly, the state appellate court later held. While appeal of the second judgment was pending, the first conviction was reversed on direct appeal. After the state court affirmed the second judgment, the high court granted certiorari and then affirmed. Distinguishing and limiting *Caldwell v. Mississippi, supra,* 472 U.S. 320, the court did "not believe that the admission of evidence regarding petitioner's prior death sentence affirmatively misled the jury regarding its role in the sentencing process so as to diminish its sense of responsibility. The admission of this evidence, therefore, did not contravene the principle established in *Caldwell.*" (*Romano v. Oklahoma, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 11].)

The court also rejected other constitutional challenges to the evidence. Regarding a due process challenge under the Fourteenth Amendment, the court stated that the "relevant question in this case . . . is whether the admission of evidence regarding petitioner's prior death sentence so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." (*Romano v. Oklahoma, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 13].) It found no such unfairness. "[I]f the jurors followed the trial court's instructions, which we presume they did [citation], this evidence should have had little—if any—effect on their

---

[1]Seven justices joined the lead opinion in *McDonough Power Equipment, Inc. v. Greenwood, supra,* 464 U.S. 548. Justice Blackmun, speaking for himself and two other justices, "join[ed] the Court's opinion," but also wrote a short concurring opinion. (*Id.* at pp. 556-557 [78 L.Ed.2d at pp. 671-672]; see *In re Hitchings, supra,* 6 Cal.4th at p. 115, fn. 5.) Nothing in that separate opinion suggests disagreement with the language quoted in the text.

deliberations. Those instructions clearly and properly described the jurors' paramount role in determining petitioner's sentence, and they also explicitly limited the jurors' consideration of aggravating factors to the four which the State sought to prove. Regardless of the evidence as to petitioner's death sentence in the [first] case, the jury had sufficient evidence to justify its conclusion that these four aggravating circumstances existed. . . . In short, the instructions did not offer the jurors any means by which to give effect to the evidence of petitioner's sentence in the [first] murder, and the other relevant evidence presented by the State was sufficient to justify the imposition of the death sentence in this case." (*Id.* at p. __ [129 L.Ed.2d at pp. 13-14].)

In a discussion particularly pertinent here, the high court concluded, "Even assuming that the jury disregarded the trial court's instructions and allowed the evidence of petitioner's prior death sentence to influence its decision, it is impossible to know how this evidence might have affected the jury. It seems equally plausible that the evidence could have made the jurors more inclined to impose a death sentence, or it could have made them less inclined to do so. Either conclusion necessarily rests upon one's intuition. To hold on the basis of this record that the admission of evidence relating to petitioner's sentence in the [first] case rendered petitioner's sentencing proceeding for the [second] murder fundamentally unfair would thus be an exercise in speculation, rather than reasoned judgment." (*Romano* v. *Oklahoma, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 14].)

With these decisions as a backdrop, we now consider the cases on which Carpenter relies. In *People* v. *Marshall, supra,* 50 Cal.3d at pages 949-950, one juror told the other jurors during deliberations that he had a law enforcement background, and stated legal principles that were both extraneous and erroneous. We found this to be misconduct giving rise to a presumption of prejudice, but also stated, "The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses: it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court. Such a weakness, however, must be tolerated. '[I]t is an impossible standard to require . . . [the jury] to be a laboratory, completely sterilized and freed from any external factors.' [Citation.] Moreover, under that 'standard' few verdicts would be proof against challenge." (*Id.* at p. 950.)

We then stated the test to apply in determining whether juror misconduct requires the judgment be set aside: "A judgment adverse to a defendant in a

criminal case must be reversed or vacated 'whenever . . . the court finds a *substantial likelihood* that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury.' [Citations.] . . . [¶] 'The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is *inherently likely* to have influenced the juror.' [Citation.]" (*People* v. *Marshall, supra,* 50 Cal.3d at pp. 950-951, italics added.) We noted that this prejudice analysis is "different from, and indeed less tolerant than, 'harmless-error analysis' for ordinary error at trial. The reason is as follows. Any deficiency that undermines the integrity of a trial—which requires a proceeding at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury—introduces the taint of fundamental unfairness and calls for reversal without consideration of actual prejudice. [Citation.] Such a deficiency is threatened by jury misconduct. When the misconduct in question supports a finding that there is a substantial likelihood that at least one juror was impermissibly influenced to the defendant's detriment, we are compelled to conclude that the integrity of the trial was undermined: under such circumstances, we cannot conclude that the jury was impartial. By contrast, when the misconduct does not support such a finding, we must hold it nonprejudicial." (*Id.* at p. 951.)

Applying this test, we found the misconduct harmless. (*People* v. *Marshall, supra,* 50 Cal.3d at pp. 951-952.)

In *People* v. *Holloway, supra,* 50 Cal.3d 1098, one juror improperly read a newspaper article during trial stating that the defendant had been on parole from prison for assaulting a woman with a hammer. This impropriety was not discovered until after the guilt phase verdicts. We noted that such misconduct gives rise to a presumption of prejudice, and discussed the significance of that presumption: " '[W]hen misconduct of jurors is shown, it is presumed to be injurious to defendant, *unless the contrary appears.*' [Citation.] We have long recognized the reason for this rule: 'A juror is not allowed to say: "I acknowledge to grave misconduct. I received evidence without the presence of the court, but those matters had no influence upon my mind when casting my vote in the jury-room." The law, in its wisdom, does not allow a juror to purge himself in that way. . . . "But, where . . . without any fault of either party . . . , a paper was communicated to the jury which might have influenced their minds, the testimony of the jurors is [not admissible] to show whether it did or did not influence their deliberations and decision. A juryman may testify to any facts bearing upon the

question of the existence of the disturbing influence, but he cannot be permitted to testify how far that influence operated upon his mind." ' (*People v. Stokes* [(1894) 103 Cal. 193, 196-197 (37 P. 207)].) That principle is now embodied in Evidence Code section 1150." (*People v. Holloway, supra,* 50 Cal.3d at pp. 1108-1109, italics added; see also *People v. Cooper* (1991) 53 Cal.3d 771, 835-836 [281 Cal.Rptr. 90, 809 P.2d 865] ["When a person violates his oath as a juror, doubt is cast on that person's ability to otherwise perform his duties."].)

The defendant need not affirmatively prove the jury's deliberations were improperly affected by the misconduct, for that cannot be done under Evidence Code section 1150 and the authority cited in *People v. Holloway, supra,* 50 Cal.3d at pages 1108-1109. Therefore, " 'The presumption of prejudice is an evidentiary aid to those parties who are able to establish serious misconduct of a type likely to have had an effect on the verdict or which deprived the complaining party of thorough consideration of his case, yet who are unable to establish by a preponderance of the evidence that actual prejudice occurred. The law thus recognizes the substantial barrier to proof of prejudice which Evidence Code section 1150 erects, and it seeks to lower that barrier somewhat.' (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 416 [185 Cal.Rptr. 654, 650 P.2d 1171].)" (*Id.* at p. 1109.)

We then applied the test of *People v. Marshall, supra,* 50 Cal.3d 907, and found the misconduct prejudicial. "The content of the article was extremely prejudicial; it revealed information about defendant's prior criminal conduct that the court had ruled inadmissible because of its potential for prejudice. The court and counsel had gone to great lengths to avoid having the jury learn of defendant's prior conviction for having assaulted a woman with a hammer. Their efforts were to no avail as to one juror—a fact that they did not learn until after it was too late to take any curative steps. [¶] . . . [¶] . . . [T]he defense went through the entire guilt phase thinking that the jury was unaware of defendant's prior record when in fact one juror had such knowledge. We cannot say at this point that [the juror's] improper knowledge had no impact. . . . [¶] Under the circumstances, we are unable to conclude that the presumption of prejudice has been rebutted." (*People v. Holloway, supra,* 50 Cal.3d at pp. 1110-1111.)

We also made clear that even one biased juror requires overturning the verdict. "Defendant was entitled to be tried by 12, not 11, impartial and unprejudiced jurors. ▪ 'Because a defendant charged with crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced.' [Citations.]" (*People v. Holloway, supra,* 50 Cal.3d at p. 1112.)

We did not hold, however, that the improper receipt of *any* potentially prejudicial information required reversal. "Our conclusion might have been different . . . if the information improperly obtained . . . had been less prejudicial." (*People* v. *Holloway, supra,* 50 Cal.3d at pp. 1111-1112.)

Our most recent decision involving juror misconduct was *In re Hitchings, supra,* 6 Cal.4th 97. There, during voir dire, a juror intentionally concealed knowledge she had about the case and, during the guilt trial, she made statements to a nonjuror indicating that she already believed the defendant was guilty. (*Id.* at pp. 116, 117.) This was clearly misconduct giving rise to the presumption of prejudice. "This presumption of prejudice ' "may be rebutted by an affirmative evidentiary showing that prejudice does not exist *or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm* to the complaining party [resulting from the misconduct]. . . ." ' " (*Id.* at p. 119, quoting *People* v. *Miranda* (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127], which itself quoted *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 417 [185 Cal.Rptr. 654, 650 P.2d 1171], italics added.) We found the presumption had not been rebutted because the evidence showed it to be " 'reasonably probable' [the juror] had prejudged the case." (*In re Hitchings, supra,* 6 Cal.4th at p. 121.)

■ To summarize, when misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. (E.g., *People* v. *Holloway, supra,* 50 Cal.3d at pp. 1110-1112; *People* v. *Marshall, supra,* 50 Cal.3d at pp. 951-952.) Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. (E.g., *In re Hitchings, supra,* 6 Cal.4th at p. 121.) The judgment must be set aside if the court finds prejudice under either test.

The first of these tests is analogous to the general standard for harmless-error analysis under California law. Under this standard, a finding of "inherently" likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment. ■ Application of this "inherent prejudice" test obviously depends upon a review of the trial record to determine the prejudicial effect of the extraneous information.

But a finding that the information was "harmless" by appellate standards, and thus not "inherently" biasing, does not end the inquiry. Ultimately, the test for determining whether juror misconduct likely resulted in actual bias is "different from, and indeed less tolerant than," normal harmless error analysis, for if it appears substantially likely that a juror is actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict. (*People* v. *Marshall, supra,* 50 Cal.3d at p. 951.) A biased adjudicator is one of the few "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." (*Arizona* v. *Fulminante* (1991) 499 U.S. 279, 309 [113 L.Ed.2d 302, 331, 111 S.Ct. 1246]; see also *Rose* v. *Clark* (1986) 478 U.S. 570, 577-578 [92 L.Ed.2d 460, 470-471, 106 S.Ct. 3101]; *Morgan* v. *Illinois* (1992) 504 U.S. 719, 729 [119 L.Ed.2d 492, 502-503, 112 S.Ct. 2222, 2229-2230]; *People* v. *Cahill* (1993) 5 Cal.4th 478, 501-502 [20 Cal.Rptr.2d 582, 853 P.2d 1037].) Thus, even if the extraneous information was not so prejudicial, in and of itself, as to cause "inherent" bias under the first test, the totality of the circumstances surrounding the misconduct must still be examined to determine objectively whether a substantial likelihood of actual bias nonetheless arose. Under this second, or "circumstantial," test, the trial record is not a dispositive consideration, but neither is it irrelevant. All pertinent portions of the entire record, including the trial record, must be considered. "The presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, *upon examining the entire record,* that there is no substantial likelihood that the complaining party suffered actual harm." (*People* v. *Hardy* (1992) 2 Cal.4th 86, 174 [5 Cal.Rptr.2d 796, 825 P.2d 781], italics added.)

In an extraneous-information case, the "entire record" logically bearing on a circumstantial finding of likely bias includes the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant. For example, the stronger the evidence, the less likely it is that the extraneous information itself influenced the verdict. An example is provided in *Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d at page 417, where we found the presumption of prejudice had been rebutted, in part because "[t]here was overwhelming proof" in support of the verdict.

We emphasize that before a unanimous verdict is set aside, the likelihood of bias under either test must be *substantial.* As indicated in the high court decisions discussed above, the criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. The jury system is fundamentally human, which is both a strength and a weakness. (*People* v. *Marshall, supra,* 50 Cal.3d at p. 950.) Jurors are not automatons. They are

imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every juror during the course of a trial is unrealistic.

If the court concludes it is substantially likely the outside information affected the verdict, or that the juror was *actually biased*, the verdict must be set aside. If not, "society's interest in the administration of criminal justice" (*Rushen* v. *Spain*, *supra*, 464 U.S. at p. 119 [78 L.Ed.2d at pp. 273-274]) must be vindicated, and the judgment preserved. It is not enough that the juror was "placed in a potentially compromising situation," for then "few trials would be constitutionally acceptable." (*Smith* v. *Phillips*, *supra*, 455 U.S. at p. 217 [71 L.Ed.2d at p. 86].)

2. *The Law Applied to This Case*

■ In finding penalty phase prejudice, the trial court analogized the misconduct and resultant extraneous information to error under *Caldwell* v. *Mississippi*, *supra*, 472 U.S. 320. For the reasons stated in *Romano* v. *Oklahoma*, *supra*, 512 U.S. __ [129 L.Ed.2d 1], this is incorrect, at least without considering the instructions the jury was given and other relevant information from the trial. (In fairness to the trial court, we note that *Romano* long postdates its decision.)

■ The court also erred in the rest of its determination and in its finding of guilt phase prejudice. As discussed in part II, *ante*, the court found that the extraneous information was inherently prejudicial in and of itself without reference to the rest of the record. It stated the evidence of guilt (as well as that supporting the penalty determination) was "overwhelming," but felt legally precluded from considering this evidence. This is incorrect. To be sure, once actual bias is found, the strength of the evidence is irrelevant; the verdict must be set aside. But such evidence is relevant in determining bias in the first place. Contrary to the dispositive finding of the court below, if the evidence was truly overwhelming, the extraneous information cannot be considered "inherently" prejudicial. This is especially true since evidence of most of the Santa Cruz County *crimes* was presented to the jury. All the juror learned out of court was the verdict of the first jury.[2]

---

[2]The fact the trial court barred evidence of the prior verdict as substantially more prejudicial than probative, although relevant, is not itself dispositive. A court's determination during trial that certain evidence is more prejudicial than probative, and therefore should not be admitted, is very different from a determination after trial that the jury's acquisition of that evidence was prejudicial in light of the entire record. (See *People* v. *Holloway*, *supra*, 50 Cal.3d at p. 1112.)

■ We also find that the surrounding circumstances do not necessarily reveal a substantial likelihood the juror actually was impermissibly influenced by the outside information. The trial court did not make any credibility-based finding that this specific juror was biased, only that the information would have improperly influenced *any* juror. Without minimizing the seriousness of the misconduct here, and " 'without detracting from the fundamental importance' " of the rights at stake (*Rushen* v. *Spain, supra,* 464 U.S. at pp. 117-118 [78 L.Ed.2d at p. 273]), on the basis of the habeas corpus record alone, we do not find a substantial likelihood the juror was biased or that the extraneous information impermissibly influenced her to the defendant's detriment.

During a long and highly publicized trial, the court and parties attempted to prevent the jury from learning of the verdict in the previous trial (although not from hearing evidence of most of the other crimes themselves). Despite these efforts, one juror learned the truth. Although unfortunate, this is hardly shocking, and does not itself show bias. Just as there is "scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge" (*Rushen* v. *Spain, supra,* 464 U.S. at p. 118 [78 L.Ed.2d at p. 273]), so too it is virtually inevitable that in a trial such as this some secrets cannot be kept. "The safeguards of juror impartiality . . . are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." (*Smith* v. *Phillips, supra,* 455 U.S. at p. 217 [71 L.Ed.2d at p. 86].)

The juror also failed to report what she had learned, as she should have. But to the extent this was misconduct, it was also *passive.* Having learned what she should not, she chose—improperly to be sure—to keep it to herself. But this alone does not show bias. Many jurors, in the middle of a long and notorious trial, might, for many reasons unrelated to bias, be reluctant to go forward and actively inject themselves into the proceedings. For example, a juror might not attach the same importance to a particular piece of information as do the parties.

The juror also told nonjurors both what she knew and that she knew it was forbidden, and later, after the verdict, denied the misconduct. But it does not follow that she thereby failed to base her verdict solely on the evidence. Telling nonjurors what she knew could not itself have prejudiced defendant. Learning the secret during the long and publicized trial (and then not reporting it) is one thing. Actually *using* the forbidden information—rather than basing the verdict on the evidence—is quite different.

The juror did not suggest that she would consider the extraneous information in reaching her verdict, or that the verdict would be based on anything other than what the trial court characterized as the "overwhelming" evidence. Moreover, the juror did not discuss the defendant's guilt or innocence, and said nothing suggesting she had prejudged the case. Her statement that she was not supposed to know the information she had obtained,

although revealing a consciousness of guilt in one sense, also showed that she was aware the knowledge was not supposed to influence her verdict. It does not indicate that she did what she knew was not allowed. Similarly, the fact the juror covered up *after* the verdict when she was challenged in order to protect herself, although certainly improper, does not show bias *during the trial, deliberations, and verdict.*

We also note the lack of evidence that the juror told any fellow jurors, as distinct from *nonjurors*, what she had learned. Carpenter argues that because prejudice is presumed, we must assume she did tell the other jurors absent affirmative evidence that she did not. That is incorrect. Although prejudice is presumed once misconduct has been established, the initial burden is on defendant to prove the misconduct. (*People* v. *Marshall, supra,* 50 Cal.3d at p. 949.) We will not presume greater misconduct than the evidence shows. On this record, we must assume the misconduct extended to learning the information and revealing it to nonjurors, but not to revealing it to other jurors.

Carpenter argues this does not matter because even one improperly influenced juror is enough to overturn the verdict. This is correct once bias is established, but the exact nature of the misconduct is highly relevant to the initial determination of bias, which is based on all the surrounding circumstances. Indeed, in *In re Stankewitz* (1985) 40 Cal.3d 391, 399-400 [220 Cal.Rptr. 382, 708 P.2d 1260], we relied heavily on the fact a juror told others what he (erroneously) thought he knew in finding prejudicial misconduct. The fact the juror here did not reveal her knowledge to the rest of the jury is not alone dispositive, but it is also not irrelevant. Rather, it is probative in two important respects. First, it tends to negate the inference the juror was biased; a biased juror would likely have told other jurors what she had learned. Second, it tends to show the juror intended the forbidden information *not* to influence the verdict.

■ The fact that the respondent below did not present affirmative evidence showing there was no prejudice also is not dispositive. The presumption of prejudice may be rebutted by an affirmative evidentiary showing *"or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct."* (*Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d at p. 417, italics added; see also *People* v. *Hardy, supra,* 2 Cal.4th at p. 176 [the presumption of prejudice was rebutted "by the evidence" of the trial itself].) As discussed in *People* v. *Holloway, supra,* 50 Cal.3d at pages 1108-1109, the presumption of prejudice merely excuses the defendant from affirmatively proving prejudice when that cannot be done. The presumption prevails " 'unless the contrary appears.' " (*Id.* at p. 1108.) If a juror applying for employment with the office of one of the attorneys in a case does not

compel a finding of bias, as in *Smith* v. *Phillips, supra*, 455 U.S. 209, so too the evidence of the habeas corpus evidentiary hearing of this case does not itself compel a finding of bias.

Our recent trio of cases is distinguishable. We found the misconduct harmless in *People* v. *Marshall, supra*, 50 Cal.3d 907. In *In re Hitchings, supra*, 6 Cal.4th 97, the juror had concealed information during jury selection, which did not occur here. We also found a reasonable probability that the juror had "prejudged the case." (*Id.* at p. 121.) There was no evidence of prejudging in this case. *People* v. *Holloway, supra*, 50 Cal.3d 1098, is factually more similar, but also distinguishable. There, evidence of the other crimes was not presented at all, and the extrinsic information was particularly prejudicial. As we noted there, the outcome might have been different had the information "been less prejudicial." (*Id.* at p. 1112.) Here, a review of the entire record may show the extrinsic information was not prejudicial.

## IV. DISPOSITION

■ We conclude that, on the basis of the habeas corpus record, the only one before us in this cause, Carpenter is not entitled to relief, and the court below erred in finding otherwise. The court thus erred in setting aside the judgment of death, which error was prejudicial to the appealing party, in effect the People. We therefore reverse the judgment granting the petition for writ of habeas corpus. We must now decide the precise disposition. We find that, although an examination of the entire record in this habeas corpus cause, including the evidence presented at the habeas corpus hearing, suffices to find that the court erroneously set aside the judgment in the underlying action, that record is not sufficient to decide whether Carpenter could ever be entitled to relief. This latter determination requires an examination, not only of the record in this cause, but also the record in the underlying appeal, which is not before us in this matter.

As discussed above, in determining prejudice to Carpenter, the record of the underlying trial, in addition to the habeas record, must be consulted. The trial court felt precluded from doing this. We could remand the matter to the court to make a new ruling. But, although determinations *during trial* whether a juror is biased and should be excused are entitled to deferential treatment by a reviewing court (*People* v. *McPeters* (1992) 2 Cal.4th 1148, 1175 [9 Cal.Rptr.2d 834, 832 P.2d 146]), as are credibility-based factual determinations by the trial court (*In re Hitchings, supra*, 6 Cal.4th at p. 109), neither of these circumstances suggests a remand here. The trial court did resolve the factual conflict in Carpenter's *favor*, which we fully accept. As we have seen, however, those factual findings do not themselves compel a finding of prejudice. Moreover, *posttrial* prejudice is a mixed question of law and fact ultimately determined by the "reviewing court." (*People* v.

*Hardy, supra,* 2 Cal.4th at p. 174; see, e.g., *People* v. *Holloway, supra,* 50 Cal.3d 1098.) Because there is now a full factual record regarding the misconduct with all conflicts in the evidence resolved and with the relevant historical facts found, little would be gained by a remand. At this point, the question is for our independent determination.

On the other hand, we have not yet fully reviewed the *entire* record. To be sure, we have carefully considered the *habeas corpus* record, and have determined that it alone does not entitle Carpenter to relief; the trial court erred in finding otherwise. But the record of the *trial* which is not before us in this cause, is different, and must be considered before the merits of Carpenter's underlying claim can be finally determined. The record in the automatic appeal promises to be massive but has not yet been certified. In his habeas corpus petition, Carpenter requested the superior court to judicially notice its records in the underlying trial, which it granted, at least impliedly. (Evid. Code, § 452, subd. (d).) On appeal, the Attorney General asks us to judicially notice those records. We grant that request (Evid. Code, § 459, subd. (a)), limited to noncontroversial facts regarding the trial referred to in this opinion that are also reflected in the habeas corpus record. But, although judicial notice properly gives us a general idea of what the trial was about, because it is uncertified, we find it inadequate to the task of making a final determination of prejudice to Carpenter. Therefore, we cannot, and do not, consider it for that purpose at this time.

The trial court stated the evidence in support of the verdicts was "overwhelming," but also cited the role the Santa Cruz crimes played in the trial. Moreover, as suggested, for example, in *Romano* v. *Oklahoma, supra,* 512 U.S. at page __ [129 L.Ed.2d at pages 13-14], the precise jury instructions may be pertinent. The record may be relevant in other ways. We cannot now effectively examine the appellate record to confidently review these matters and decide whether Carpenter was prejudiced. Because of this, it seems prudent not to make a definitive determination of this question at this time, but to reserve it pending a cause in which the appellate record, as well as the record in this cause, is before us.

To resolve this conundrum—which potentially exists in any appeal from a grant of habeas corpus relief such as this—we will reverse the trial court's granting of relief, and provisionally deny the petition at this time. But the denial is without prejudice to Carpenter filing a new petition in this court raising the issue in a manner consistent with this opinion, and based upon the combined records of the habeas corpus proceeding and the underlying trial. Any new petition, which may or may not contain additional claims for relief, would be filed in the same manner, and be subject to the same rules, as any other petition in a death penalty case. We will then consider any such petition after the appellate record has been certified.

Accordingly, the judgment of the superior court granting the petition for writ of habeas corpus is reversed, and the petition is denied without prejudice to Carpenter's filing a new petition in this court in a manner consistent with this opinion.

Baxter, J., George, J., and Werdegar, J., concurred.

**MOSK, J.**—I dissent.

This is the easy case that makes bad law. In their efforts to find undisputed and serious juror misconduct harmless, the majority conduct an analysis that is specious and fabricate a disposition that is wrong. I refuse to follow.

I

In the Santa Cruz Superior Court, the People accused David Joseph Carpenter of certain offenses committed in that county in the spring of 1981. Specifically, they charged him in five counts with: (1) the murder of Ellen Marie Hansen, with allegations, for death eligibility, that he acted under the special circumstances of felony-murder rape, lying in wait, and multiple murder; (2) the attempted rape of Hansen; (3) the attempted murder of Steven Russell Haertle, with allegations, for enhancement of sentence, that he personally used a firearm and intentionally inflicted great bodily injury; (4) the murder of Heather Scaggs, with allegations that he acted under the special circumstances of felony-murder rape and multiple murder; and (5) the rape of Scaggs. Carpenter pleaded not guilty to the charges and denied the allegations.

After change of venue to Los Angeles County because of pretrial publicity, the superior court called the cause to trial before a jury. After the guilt phase, the jury returned verdicts of guilty as to each of the charges, fixing each of the murders at the first degree, and also returned findings of true as to each of the allegations. After the penalty phase, it returned a verdict of death for each of the murders.

The superior court rendered judgment accordingly. For each of the murders, it imposed a sentence of death. For the related offenses, it suspended imposition of sentence. Our clerk then docketed an automatic appeal.

Subsequently, in San Diego Superior Court, after change of venue from Marin County because of pretrial publicity, the People accused Carpenter of certain offenses committed in the latter county in the fall of 1980. Specifically, they charged him in eight counts with: (1) the murder of Cynthia Toshiko Moreland, with an allegation that he personally used a firearm; (2) the murder of Richard Edward Stowers, with an allegation that he personally used a firearm; (3) the murder of Anne Evelyn Alderson, with allegations that he acted under the special circumstance of felony-murder rape and that

he personally used a firearm; (4) the rape of Alderson, with an allegation that he personally used a firearm; (5) the murder of Diane Marie O'Connell, with allegations that he acted under the special circumstance of felony-murder rape and that he personally used a firearm; (6) the attempted rape of O'Connell, with an allegation that he personally used a firearm; (7) the murder of Shauna Catherine May, with allegations that he acted under the special circumstance of felony-murder rape and that he personally used a firearm; and (8) the rape of May, with an allegation that he personally used a firearm; there was also an allegation, separate and independent from any individual count, that he committed the five charged murders under the special circumstance of multiple murder. Carpenter pleaded not guilty to the charges and denied the allegations.

Prior to trial, the superior court, presided over by Judge Herbert B. Hoffman, ruled on the admissibility of evidence of the Santa Cruz "Trailside Murders." It was the theory of both the People and Carpenter that a single individual committed both the Santa Cruz and the Marin "Trailside Murders"—the former claiming, and the latter denying, that that individual was Carpenter. For the guilt phase, Judge Hoffman permitted evidence of the facts underlying all the offenses in question except those against Scaggs, having determined, inter alia, that the latter were substantially more prejudicial than probative under Evidence Code section 352. For the penalty phase, he permitted evidence of the facts underlying all the offenses without exception. For both phases, however, he barred evidence of Carpenter's convictions and death sentences as substantially more prejudicial than probative.

During jury selection, Judge Hoffman examined numerous prospective jurors along with counsel. Throughout, he continually and specifically admonished them, in accordance with Penal Code section 1122, to the effect that "it [was] their duty not to converse among themselves or with anyone else on any subject connected with the trial, or to form or express any opinion thereon until the cause [was] finally submitted to them." He also continually and specifically admonished them to avoid publicity relating to the case. Lastly, he admonished them to immediately advise any person who might attempt to discuss the case with them that they could not do so, and to immediately report the matter if such person should persist.

Included among the prospective jurors were two women who each came forward to disclose that she had read a newspaper article reporting that Carpenter had been convicted of the Santa Cruz "Trailside Murders" and had been sentenced to death therefor. The People immediately challenged both for cause: "We just can't leave on people who have read that article. It would poison this whole thing . . . . [W]e just can't infest [sic] this case with that kind of error." "I have no doubt in my mind that . . . this case

would be reversed" if Carpenter suffered an adverse judgment. Judge Hoffman excused the two women. He later informed apparently all the other prospective jurors of his action.

Also included among the prospective jurors was Barbara Durham. On voir dire, Durham stated that she had not heard of the "Trailside Murders." She was subsequently chosen as one of the 12 jurors. Together with the other 11, she evidently swore, in conformity with the oath prescribed by statute, that she would "well and truly try" the cause and "a true verdict render according to the evidence." (Code Civ. Proc., former § 604 [enacted 1872, repealed Stats. 1988, ch. 1245, § 7, p. 4155]; accord, id., § 232, subd. (b).)

During the guilt phase, evidence of the facts underlying the Santa Cruz "Trailside Murders," except the Scaggs offenses, was introduced, and turned out to play a large role. Evidence of the resulting convictions and death sentences was not presented and hence did not figure. Throughout, Judge Hoffman continually and specifically gave the jury admonitions that he had given previously, viz., not to discuss the case or form or express any opinion thereon, and to avoid related publicity.

With Juror Durham as foreperson, the jury returned verdicts of guilty as to all the charges, fixing each of the murders at the first degree, and also returned findings of true as to all the allegations.

During the penalty phase, too, evidence of the facts underlying the Santa Cruz "Trailside Murders," including the Scaggs offenses, was introduced, and turned out to play a large role. Again, evidence of the resulting convictions and death sentences was not presented and hence did not figure. Throughout, Judge Hoffman continually and specifically gave the jury admonitions that he had given previously, viz., not to discuss the case or form or express any opinion thereon, and to avoid related publicity.

With Juror Durham as foreperson, the jury returned a verdict of death for each of the murders.

Judge Hoffman rendered judgment accordingly. For each of the five murders, he imposed a sentence of death. For the other offenses, he imposed a sentence of imprisonment for a total term of 22 years, which he stayed temporarily pending execution of the sentence of death and permanently thereafter. Our clerk then docketed an automatic appeal.

II

Carpenter filed a petition for writ of habeas corpus in the San Diego Superior Court challenging the judgment in the Marin "Trailside Murder" case shortly after its rendition. At the threshold, he made allegations that the superior court had subject matter jurisdiction over the habeas corpus proceeding challenging the judgment, notwithstanding the pendency in this

court of an automatic appeal therefrom. In its core, he made allegations that Juror Durham had committed prejudicial misconduct that did not appear of record—specifically and fundamentally, that she had received information outside of court relating to the then-pending Marin "Trailside Murder" case, viz., his Santa Cruz "Trailside Murder" convictions and death sentences; and that she had discussed *that* case and *those* convictions and death sentences with nonjurors. In support, he incorporated various declarations referring to "Mr. A" and a "female friend" as percipient witnesses. He requested the superior court to take judicial notice of its own records relating to the Marin "Trailside Murder" case pursuant to Evidence Code section 452, subdivision (d). Judge Hoffman, who had presided over the trial, was assigned the matter. He subsequently granted the request for judicial notice, impliedly if not expressly.

Judge Hoffman ordered the Director of Corrections to show cause why the relief Carpenter sought should not be granted.

The Director of Corrections filed a return. He denied that Carpenter was entitled to relief. Specifically, he alleged that Judge Hoffman lacked subject matter jurisdiction over the habeas corpus proceeding challenging the judgment because of the pendency in this court of an automatic appeal therefrom.[1] He also alleged that there had been no misconduct by Juror Durham, prejudicial or otherwise. In support, he incorporated declarations by Juror Durham and her husband Ronald Durham. His counsel went so far as to belittle Carpenter's allegations about Juror Durham as without support.

Carpenter filed a traverse. He realleged the facts in his petition as to both subject matter jurisdiction and prejudicial juror misconduct. In addition, he denied the contrary allegations that the Director of Corrections had made in his return on each of these two points. He also alleged new facts as to the latter. In support, he incorporated declarations by Michael Lustig, who was "Mr. A," and Donna Duran, who was his "female friend."

The Director of Corrections filed a memorandum of points and authorities in reply. He continued to dispute subject matter jurisdiction, but not prejudicial juror misconduct. It had by then been learned that, before the filing of the return, his counsel had obtained evidence supporting Carpenter's allegations about Juror Durham, and had attempted to prevent that evidence from coming to light.[2] Judge Hoffman would later express his "dismay" at that conduct.

---

[1]This in spite of the fact that it had been settled since *France* v. *Superior Court* (1927) 201 Cal. 122 [255 P. 815, 52 A.L.R. 869], that what is now section 10 of article VI of the California Constitution grants such jurisdiction *concurrently* to the superior court, the Court of Appeal, and this court. See footnote 2, *post*.

[2]The Director of Corrections' allegations about Judge Hoffman's lack of subject matter jurisdiction should perhaps be considered in light of this fact. See footnote 1, *ante*.

Judge Hoffman ruled, inter alia, that he did in fact have subject matter jurisdiction over the habeas corpus proceeding challenging the judgment, "relating" as it does "to matters outside the trial record," notwithstanding the pendency in this court of an automatic appeal therefrom. Noting, inter alia, that he was "familiar" with Juror Durham, he determined that his exercise of subject matter jurisdiction was appropriate in view of "the interests of justice, judicial economy, and the avoidance of potentially prejudicial delay to both parties."[3]

Thereupon, Judge Hoffman ordered an evidentiary hearing on juror misconduct. He imposed on Carpenter, as the petitioner, the burden of proving the facts underlying his claim by a preponderance of the evidence. To carry his burden, Carpenter presented extensive evidence, mainly through Lustig and Duran. For his part, the Director of Corrections presented extensive evidence as well, mainly through Juror Durham and her husband Ronald.

Judge Hoffman characterized the evidentiary hearing that transpired as a "classic credibility contest" between Lustig and Duran, on one side, and Juror Durham and her husband Ronald, on the other. He proceeded to resolve the contest in favor of the former and against the latter. Lustig's testimony was "credible . . . in almost all respects." Duran's was credible in all respects without exception. By contrast, the testimony of Ronald was doubtful. That of Juror Durham herself was more doubtful still; indeed, in its general denial of misconduct, it was perjurious.

From all the evidence, Judge Hoffman determined, in substance, that Juror Durham had in fact committed misconduct by receiving information outside of court relating to the then-pending Marin "Trailside Murder" case, viz., Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences. By March 26, 1988—a date in the middle of the guilt phase that will show itself to be critical in due course—Juror Durham had received the forbidden information from newspaper accounts, either directly—she was an avid newspaper reader who had bristled under Judge Hoffman's admonition to avoid publicity—or, more likely, through her husband Ronald. Until at least March 26, 1988, the couple received delivery of a newspaper at their home. They had stated in their declarations, but falsely, that they had canceled their subscription, in order to avoid publicity, around the opening of the guilt phase: rather, they ordered cancellation much later—on, or as of, March 26, 1988. At all times relevant here, they were experiencing drinking problems and marital troubles. Juror Durham, of course, sat on Carpenter's trial for the

---

[3]Subsequently, the Director of Corrections filed a petition for writ of mandate and/or prohibition in this court challenging the superior court's ruling on subject matter jurisdiction, but met with summary denial.

Marin "Trailside Murders." Ronald openly criticized the trial, evidently from its commencement, as a waste of time and money, having learned that Carpenter had already been convicted and sentenced to death for the Santa Cruz "Trailside Murders." The "situation" was "very explosive," presenting an "opportunity for a verbal battle between husband and wife while parties have been drinking." "[O]n many occasions he apparently told her when she would come home from this trial, . . . 'I know so much more about this case than you do.' [¶] . . . I don't know what would provoke that kind of response unless Mrs. Durham is somehow talking about aspects of the case." He had the "opportunity . . . to let his wife know in no uncertain terms that you're just wasting your time on this trial because Mr. Carpenter has already got the death sentence and he's been convicted of similar crimes."

Judge Hoffman also determined, in substance, that Juror Durham had in fact committed misconduct by discussing the then-pending Marin "Trailside Murder" case and also Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences with nonjurors, including Lustig and Duran. On March 26, 1988—the date referred to above—Lustig and Duran were taking dinner, along with others, at the Lakeland Resort in the small community of Julian in San Diego County; Lustig noticed Juror Durham and her husband Ronald nearby, and invited them to his table; Lustig and Duran were merely social acquaintances of the Durhams and not intimate friends; once at Lustig's table, Juror Durham initiated a five- or ten-minute conversation about the Marin "Trailside Murder" case; in its course, she made a statement, as if boastfully, to the effect that "We"—meaning the jury—"are not supposed to know this, but Carpenter has already been convicted and sentenced to death for the Santa Cruz 'Trailside Murders.'" During trial, Juror Durham had shown herself to be an "outspoken person," indeed a "very outspoken" person, and to have "no hesitancy talking about her marital problems" even "with a virtual stranger . . . . And . . . that's something similar to the fact that she would share with a stranger her confidential information about this case." "[S]he wanted to be the center of attention that night, and that kind of disclosure placed her in the center of attention with the Lustig[]" party. She admitted she had discussed the Marin "Trailside Murder" case with Lustig and Duran on the date in question. But she denied making the statement revealing that she knew the forbidden information and knew it was forbidden. She perjured herself thereby.

Judge Hoffman then ordered a hearing on prejudice. At the threshold, he determined—correctly—that juror misconduct was not reversible per se, but raised a presumption of prejudice, which the Director of Corrections had to rebut, if he could, or lose the challenged judgment. He followed the Court of Appeal's decision in *People* v. *Martinez* (1978) 82 Cal.App.3d 1 [147

Cal.Rptr. 208] (hereafter sometimes *Martinez*), which looked to whether the extrajudicial information underlying the misconduct had adversely affected the impartiality of at least one juror, had lightened the prosecution's burden of proof, or had contradicted the defendant's defense.[4] This court's decisions in *People* v. *Marshall* (1990) 50 Cal.3d 907 [269 Cal.Rptr. 269, 790 P.2d 676] (hereafter sometimes *Marshall*), *People* v. *Holloway* (1990) 50 Cal.3d 1098 [269 Cal.Rptr. 530, 790 P.2d 1327] (hereafter sometimes *Holloway*), and *In re Hitchings* (1993) 6 Cal.4th 97 [24 Cal.Rptr.2d 74, 860 P.2d 466] (hereafter sometimes *Hitchings*), had not yet been handed down. *Marshall*, *Holloway*, and *Hitchings* superseded *Martinez*, replacing its three-pronged standard with their own "substantial likelihood" test, which asks whether there is a substantial likelihood, objectively assessed, that the extrajudicial information underlying the misconduct impermissibly influenced at least one juror.[5]

After the hearing on prejudice, at which the Director of Corrections did not seek to introduce any evidence, Judge Hoffman determined that Juror Durham's misconduct was indeed prejudicial. He found, inter alia, that her impartiality had been adversely affected—that is to say, that she had not been impartial; that the People's burden of proof had been lightened; and that Carpenter's defense had been contradicted. Expressly or impliedly, he relied on, among other things, the nature of the information she had received outside of court relating to Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences; the circumstances surrounding its receipt; her statement to the effect that "We are not supposed to know this, but Carpenter has already been convicted and sentenced to death for the Santa

---

[4]See *People* v. *Martinez, supra,* 82 Cal.App.3d at page 22: "[I]t is clear that the usual 'harmless error' tests for determining the prejudicial effect of an error (*Chapman* v. *California* (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 827-828, 24 A.L.R.3d 1065]; *People* v. *Watson* [(1956)] 46 Cal.2d 818, 836 [299 P.2d 243]) are inapplicable. Convincing evidence of guilt does not deprive a defendant of the right to a fair trial [citation] since a fair trial includes among other things the right to an unbiased jury, the presumption of innocence, and the right to assert a defense after the prosecution has presented its case in chief. Thus, whether a defendant has been injured by jury misconduct in receiving evidence outside of court necessarily depends upon whether the jury's impartiality has been adversely affected, whether the prosecution's burden of proof has been lightened and whether any asserted defense has been contradicted. If the answer to any of these questions is in the affirmative, the defendant has been prejudiced and the conviction must be reversed."

[5]See *People* v. *Marshall, supra,* 50 Cal.3d at page 950: "A judgment adverse to a defendant in a criminal case must be reversed or vacated 'whenever . . . the court finds a substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury.' " (Accord, *In re Hitchings, supra,* 6 Cal.4th at p. 118; *People* v. *Holloway, supra,* 50 Cal.3d at p. 1109.)

See *People* v. *Marshall, supra,* 50 Cal.3d at page 951: " 'The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard.' " (Accord, *People* v. *Holloway, supra,* 50 Cal.3d at p. 1109.)

Cruz 'Trailside Murders' "—which revealed both knowledge of the forbidden information and knowledge of the fact that it was forbidden; her immediate and deliberate attempt to cover up her misconduct by canceling her newspaper subscription, and her immediate and manifest consciousness of guilt; her observed attitudes and actions during the Marin "Trailside Murder" trial, as seen from the perspective of the evidentiary hearing; her false declaration about the newspaper-subscription cancellation; her demeanor at the evidentiary hearing; and her perjury on the witness stand during its course.

Judge Hoffman's reasoning in support of his ruling on prejudice is crucial. It demands to be set out at length.

Judge Hoffman provided the following introduction.

". . . In this case, . . . the Court found that Barbara Durham, the foreperson of the Carpenter jury, had committed juror misconduct and that she had violated the Court's admonition not to read about or discuss the David Carpenter case. And as a result of her misconduct, the Court finds that she learned that the defendant had been convicted of other similar crimes and that a death penalty sentence had been imposed on the defendant in the other case.

"As a result of this misconduct—a presumption of prejudice arises from any juror misconduct, which may be rebutted by an affirmative evidentiary showing that the prejudice does not exist or by a reviewing court's examination of the entire record to determine where there is a reasonable possibility of actual harm to the complaining party resulting from the misconduct which the Court finds to mean is that could have this affected any juror's impartiality, and the Court should review the entire record to make that determination.

"And unless the prosecution rebuts this presumption of prejudice by proof that no prejudice resulted, the cases hold that the defendant is entitled to a new trial."

Earlier in the hearing, Judge Hoffman had asked, "What do you look at the entire record for . . . ?" Straightway, he answered, "It's whether or not the juror—as I read it, it's whether or not the juror has been biased against the defendant or whether or not the juror's impartiality has been compromised because of misconduct."

Judge Hoffman went on: "I think really the question is, you know, does—regardless—and I think this is a correct statement of the law, that

regardless of the strength of the prosecution's case, every defendant is entitled to a verdict by 12 fair and impartial jurors, that's what this whole system is about, and not 11, not 10 or 9, but 12.

"And if one of those jurors, regardless of the strength of the prosecution's case, which in this case was as strong as any case I've ever seen as a judge or prosecuted when I was a prosecutor, it was that strong, but if the juror's impartiality is compromised, the defendant has not received what the Constitution offers to him and what we all trust that every defendant will get, a fair jury trial before 12 impartial jurors.

"And the question really is, regardless of the strength of the case, was Mrs. Durham's impartiality compromised? And you have to—I think you have to look at that in the context of the case itself."

With regard to Juror Durham's perjurious denial at the evidentiary hearing of her receipt of extrajudicial information about Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences, Judge Hoffman posed the rhetorical question: "And then you get to the—then you get to the hearing and the confrontation, she denies it. . . . Now what inferences can you draw from the fact that when she's confronted, she denies it, as to her impartiality[?]"

In making his ruling on prejudice, Judge Hoffman proceeded thus: "Whether a defendant has been injured by jury misconduct in receiving evidence outside of court as the case of *People* v. *Martinez* has held is a three-prong test. The first part of the test is whether the juror's impartiality has been adversely affected; second, whether the prosecution's burden of proof has been lightened; and third, whether any asserted defense by the defendant has been contradicted by the misconduct.

"The *Martinez* court has held that if the answer to any of these questions is in the affirmative, that the defendant has been prejudiced and the conviction must be reversed. Both the prosecution and the defendant in this case agree that *People* vs. *Martinez* is the proper test for the Court to determine in evaluating the misconduct of Barbara Durham.

"Since jury misconduct is not per se reversible, if the Court's review of the entire record demonstrates that the defendant has suffered no prejudice in any of the three areas described from the misconduct, then a reversal and new trial is not compelled." (Italics added in place of full capitalization in original.)

Judge Hoffman first analyzed the question of prejudice as to the issue of penalty.

"The case of *Caldwell* vs. *Mississippi* [(1985) 472 U.S. 320 (86 L.Ed.2d 231, 105 S.Ct. 2633)], a recent Supreme Court [of the] United States case, has held that it's constitutionally impermissible to rest a death sentence on a determination made by a juror who has been led to believe that the responsibility for the defendant's death rests elsewhere [than] in that juror's determination." (Italics added in place of full capitalization in original.)

"Now, in this case the Court found that Mrs. Durham had knowledge from her husband that Mr. Carpenter, because of a conviction in similar crimes, had been given the death sentence by another jury. In this Court's judgment, without any question, this information would serve to minimize her sense of responsibility in making the difficult and uncomfortable penalty determination.

"She could very likely have concluded that since a person can be executed only once, the second death penalty sentence, the one that she was contemplating, was a mere formality, and the real possibility for the defendant's— responsibility for the defendant's death sentence belonged to the first jury and not herself.

"This Court finds as a result of Mrs. Durham's knowledge with respect to Mr. Carpenter's prior death sentence that the prosecution is unable to rebut the presumption of prejudice that arises out of the facts in this case and that the very real possibility of actual harm to the defendant as a result of Mrs. Durham's misconduct is completely apparent in the context of the penalty phase deliberations.

"And so the Court finds, in applying the *Martinez* test to the penalty phase in this case, the Court finds that Mrs. Durham would have her impartiality compromised against the defendant by knowing that another jury of 12 has concluded that he is a person worthy of the death sentence and that would affect her decision.

"The prosecution's burden of proof in this case in the penalty phase," to the extent that such burden existed, "has been lightened by the fact that Mrs. Durham knew that Mr. Carpenter had been sentenced to the death penalty.

"There is simply no way that she could have given the—no matter what she felt about Mr. Carpenter, there's no way that she could have given that the same kind of consideration knowing on the one hand that the defendant already had been sentenced to death by another jury. So I think the prosecution's burden to that extent was lightened.

"And it also certainly affected her ability to judge the defense that Mr. Carpenter was presenting with respect to an offer of life imprisonment.

Basically, I think she would have to say, 'What difference does that make because he's going to die anyhow, no matter what they tell us about it?' So she couldn't have treated it in the same light. So I really don't think there's any question, whatsoever.

"[The prosecution] . . . failed . . . to rebut the presumption of prejudice with respect to the penalty phase." (Italics added in place of full capitalization in original.)

Judge Hoffman then analyzed the question of prejudice as to the issue of guilt.

"Now, in the guilt phase of this case the Court finds that the evidence of guilt is overwhelming. And . . . I believe that without a shadow of a doubt that Mr. Carpenter was guilty of the charges that were presented against him without any question.

"Now, the cases have never articulated the standard to be applied by an appellate court in determining whether the presumption of prejudice has been rebutted, but I find . . . that it's clear that the usual harmless error tests for determining the prejudicial effect of an error is inapplicable, and that's *People* vs. *Watson* [(1956) 46 Cal.2d 818 (299 P.2d 243)] and *Chapman* vs. *California* [(1967) 386 U.S. 18 (17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065)].

"Convincing evidence of guilt does not deprive the defendant of a right to a fair trial since a fair trial includes, among other things, the right to an unbiased jury, the presumption of innocence and the right to assert a defense after the prosecution has presented its case-in-chief." (Italics added in place of full capitalization in original.)

"Now, with respect to the guilt phase, to rebut the presumption of prejudice the People must show that Mrs. Durham remained impartial despite her knowledge of appellant's other convictions for similar crimes and death sentence, and also, as the *Martinez* test states, the prosecution's burden of proof was not lightened, and that no assert[ed] defenses had been contradicted. That is a factual situation, and the likelihood of the same verdict despite the misconduct is of no consequence.

"There are cases where a presumption of prejudice has been rebutted. . . .

"Factors which have been considered are whether the extrajudicial information was inherently *nonprejudicial*, whether the information pertained to

matters unrelated to the pending case, whether the Court had an opportunity to alleviate the potential prejudice with a curative admonition to the jurors.

"In this case the Court cannot find that the misconduct committed by Ms. Durham and the information she received was innocuous or of a trivial nature. I would find that the extrajudicial information that caused her misconduct was inherently prejudicial. It related directly to the pending action. And the Court was unable to give a curative admonition to the jury—to the juror in this case.

"Analyzing the criteria set forth in *Martinez*, the respondent has not made a factual showing sufficient to rebut the presumption of prejudice in this case as to the guilt phase. In this case, the nature of the information was such that the juror's impartiality could not be anything but adversely affected.

"The fact that the juror, first of all, knew that Mr. Carpenter was the kind of person that 12 other people had sentenced—chose to sentence to death, in my judgment, could not but affect her determination of whether or not she could remain a fair and impartial juror as to this case and in evaluating the evidence . . . . So I definitely believe it affects her impartiality.

"As to whether or not the prosecution's burden was lightened in this case, this unique aspect of this case makes the information Mrs. Durham knew highly prejudicial, and that's the fact that it was conceded by the defense and argued by the prosecution that one person committed both the Santa Cruz and the Marin murders.

"And the evidence really supported that theory. Both the defense assumed it and the prosecution argued it. And if the juror in this case, Ms. Durham, believed or understood that 12 other persons had found the petitioner, Mr. Carpenter, guilty of the Santa Cruz murders beyond a reasonable doubt, the prosecutor's job of proving the petitioner guilty beyond a reasonable doubt in the Marin cases would be much easier.

"And . . . I don't see any sense to re-elaborate on that question, the uniqueness of this case. I think the record is clear.

"Of the time involved in the guilt phase of the trial, I would estimate that two-thirds of that time was directed at the evidence of the Santa Cruz . . . incident[s] and the remaining one-third was directed at proving the Marin crimes. That's how important they were. And that's what makes—" (Italics added in place of full capitalization in original.)

"And every pretrial ruling that I made in this case was in an effort in keeping from the jury the fact that there had been a determination, especially

when there was no question in this case that [the] theory on both sides was one murderer is all the murderers, if he's the murderer in [Santa Cruz], he's the murderer in all the Marin cases. If he's not, he's not the murderer in the Marin cases." "And so I felt, to give Mr. Carpenter a fair trial, in pretrial rulings, that that fact could not be made available to the jury or it just sounded the death bell for him. There was no chance after that. And that's why I made the rulings that I did.

"Everything was done in this case by the Court, as I've stated, to keep from the jury the evidence that Mr. Carpenter had been convicted of the Santa Cruz crimes . . . in the guilt phase. And everything was done by this Court in its rulings to keep from the jury in the penalty phase that Mr. Carpenter had been sentenced to death as a result of the Santa Cruz crimes. And despite everything that was done by way of evidentiary rulings and the like, this is exactly the information that Mrs. Durham had.

"As to the third prong of the *Martinez* test, that the petitioner asserts a defense, in this case, that he was not the trailside killer, that was certainly undermined by the knowledge that another jury had found that he was in fact the trailside killer.

"So I can't find that that prong has been rebutted, either. And any one of the three prongs that has not been rebutted would be sufficient enough to give Mr. Carpenter a new trial." (Italics added in place of full capitalization in original.)

For the benefit of the Director of Corrections, Judge Hoffman added: "[T]he Court believes that if—had this jury been completely impartial, that applying the reasonable doubt standard [of *Chapman* v. *California* (1967) 386 U.S. 18, 24 (17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065)], I would find that despite the information that Ms. Durham knew, because of the gravity of the crimes themselves, first of all, I would find beyond a reasonable doubt that any jury would have sentenced the defendant to the death penalty based upon the evidence presented and would also find that the evidence was so overwhelming with respect to the defendant's guilt that if the harmless error standard applied in this case, that Mrs. Durham's misconduct, if you could apply the harmless error standard to juror misconduct, I would find that her knowledge would be harmless beyond a reasonable doubt because of the overwhelming nature of the evidence in this case and as well as the overwhelming proof of the gravity of the aggravating circumstances in the penalty phase so completely outweighed and dominated the mitigation factors that the jury would make that result."

Judge Hoffman concluded with the statement that, in ordering a new trial, he did so "regrettably . . . because this [disposition] is not one that is

particularly gratifying to the Court, given all the time and effort that was put in by the other jurors in this case, the clerk, staff, the attorneys, everybody connected with this case. This is an absolute travesty that such a result could happen to such a case. [¶] And I find the fault with the foreperson in this case, Barbara Durham. And . . . a letter is going to be delivered to the Attorney General's office in San Diego as well as to the District Attorney's office for the County of San Diego that will state," among other things, "[t]hat I believe the matter should be reviewed for possible criminal prosecution under Penal Code Section 96," which, inter alia, subjects to fine or imprisonment any juror who "[w]illfully and corruptly permits any communication to be made to him, or receives any . . . information relating to any cause or matter pending before him, except according to the regular course of proceedings." The indicated letter was, in fact, delivered.[6]

Thereupon, Judge Hoffman rendered his judgment and order vacating the challenged judgment. Our clerk then docketed an automatic appeal.

### III

It is of course misconduct for a juror to receive information outside of court relating to the pending case. We so held—and not for the first time—in *Holloway*. There, we explained: " 'Jurors in a criminal action are sworn to render a true verdict according to the evidence. They cannot, under the oath which they take, receive impressions from any other source.' " (*People* v. *Holloway, supra,* 50 Cal.3d at p. 1108, quoting *People* v. *McCoy* (1886) 71 Cal. 395, 397 [12 P. 272].) Under that oath, prescribed by statute, they swear that they will " 'well and truly try' " the cause and " 'a true verdict render *according . . . to the evidence . . . .* ' " (Code Civ. Proc., § 232, subd. (b), italics added; accord, *id.,* former § 604.) A juror's receipt of extrajudicial information about the case "deprives [the parties] of the opportunity to conduct cross-examination, offer evidence in rebuttal, argue the significance of the information to the jury, or request a curative instruction." (*United States* v. *Bagnariol* (9th Cir. 1981) 665 F.2d 877, 884, fn. 3.)

It is also misconduct for a juror to discuss a pending case with nonjurors. We so held—and not for the first time—in *Hitchings*. There, we explained:

---

[6]The record reflects that the Attorney General responded to Judge Hoffman's letter, as follows: "The Attorney General's office will not review the matter for possible criminal charges against Ms. Durham, but will leave that to the District Attorney. [¶] As the public prosecutor for the county, the District Attorney is the appropriate official to review the matter. Also, the Attorney General represents the People on Carpenter's automatic appeal from the San Diego County death sentence which is now pending before the California Supreme Court, and will represent [the Director of Corrections] on any review of [the] order in the habeas corpus proceeding."

The record is silent, however, as to any response to Judge Hoffman's letter by the San Diego District Attorney.

"Penal Code [section 1122] provides that jurors must not 'converse among themselves *or with anyone else* on any subject connected with the trial . . . .' " (*In re Hitchings, supra,* 6 Cal.4th at p. 118, italics added.) "Violation of this duty is serious misconduct." (*Ibid.*)

In this proceeding, Judge Hoffman determined that Juror Durham committed misconduct by receiving information outside of court relating to Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences. Beyond all doubt, he was correct.

Judge Hoffman had rightly imposed on Carpenter, as the petitioner, the burden of proving the facts underlying his claim by a preponderance of the evidence. (E.g., *People* v. *Ledesma* (1987) 43 Cal.3d 171, 243 [233 Cal.Rptr. 404, 729 P.2d 839] (conc. opn. of Grodin, J.).) He carried his burden here. It was undisputed that *if* Juror Durham had received information relating to his Santa Cruz "Trailside Murder" convictions and death sentences, she had received it outside of court. The record establishes that the condition was satisfied. The proof is the words she spoke on March 26, 1988, to the effect that "We are not supposed to know this, but Carpenter has already been convicted and sentenced to death for the Santa Cruz 'Trailside Murders.' " Her remark revealed both knowledge of the forbidden information and knowledge of the fact that it was forbidden. At the evidentiary hearing, she denied her words. But she perjured herself thereby. She must be deemed to have violated her statutory duty to render "a true verdict render *according to the evidence*" (Code Civ. Proc., former § 604, italics added; accord, *id.,* § 232, subd. (b)) by receiving information outside of court (*People* v. *Holloway, supra,* 50 Cal.3d at p. 1108). She did not do so innocently or out of ignorance. Certainly, she did not commit a merely "technical" breach. She had taken an oath against such a violation. In addition, she had been admonished in that regard, continually and specifically. To be sure, she may not have knowingly and willfully *obtained* the forbidden information in contravention of the letter of Judge Hoffman's order when she first learned of the facts in question. But, without doubt, she knowingly and willfully *retained* such information against the spirit of his order when she failed to make any disclosure concerning the matter.

Judge Hoffman also determined that Juror Durham committed misconduct by discussing the then-pending Marin "Trailside Murder" case with nonjurors. Here too, beyond all doubt, he was correct. Carpenter carried his burden of proof in this regard as well. Juror Durham admitted she had discussed the Marin "Trailside Murder" case with Lustig and Duran on March 26, 1988. In addition, she was impliedly found to have discussed it with her husband Ronald on several occasions. It follows that she violated

the duty imposed by Penal Code section 1122 not to converse about the case with the other jurors or "with anyone else . . . ." She did not do so innocently or out of ignorance. Here too, she did not commit a merely "technical" breach. She had been admonished against such a violation, continually and specifically. She had also been admonished to immediately report any person who might persistently attempt to discuss the case, but had failed to do so. One point bears special emphasis: By revealing to Lustig and Duran, as if boastfully, that she knew that the forbidden information about Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences *was in fact forbidden*, she showed not only a readiness to violate her duty, but also a willingness to flaunt her violation.

Proceeding from juror misconduct to its consequences, we must next consider the question of prejudice. That is because juror misconduct "is not per se reversible . . . ." (*People v. Martinez, supra,* 82 Cal.App.3d at p. 22.)

"As a general rule, juror misconduct 'raises a presumption of prejudice . . . .' " (*In re Hitchings, supra,* 6 Cal.4th at p. 118.) The "general rule" operates for a juror's receipt of information outside of court relating to the pending case (e.g., *People v. Holloway, supra,* 50 Cal.3d at p. 1108) and also for a juror's discussion of the case with nonjurors (e.g., *In re Hitchings, supra,* 6 Cal.4th at p. 119). "When a person violates his oath as a juror, doubt is cast on that person's ability to otherwise perform his duties." (*People v. Cooper* (1991) 53 Cal.3d 771, 835-836 [281 Cal.Rptr. 90, 809 P.2d 865].)

As stated, juror misconduct raises a *presumption* of prejudice. That presumption is not conclusive, but is instead rebuttable. (E.g., *In re Hitchings, supra,* 6 Cal.4th at p. 118; *People v. Holloway, supra,* 50 Cal.3d at p. 1108.) The party seeking to salvage the challenged judgment bears the burden. If he does not carry the latter, he loses the former.

The prejudice analysis pertinent to the kind of juror misconduct with which we are concerned is set out in *Marshall, Holloway,* and *Hitchings,* which articulate and apply the "substantial likelihood" test: is there a substantial likelihood, objectively assessed, that the extrajudicial information underlying the misconduct impermissibly influenced one or more jurors?

"Such 'prejudice analysis' is different from, and indeed less tolerant than, 'harmless-error analysis' for ordinary error at trial. The reason is as follows. Any deficiency that undermines the integrity of a trial—which requires a proceeding at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury—introduces the taint of fundamental unfairness and calls for reversal without consideration

of actual prejudice. [Citation.] Such a deficiency is threatened by jury misconduct. When the misconduct in question supports a finding that there is a substantial likelihood that at least one juror was impermissibly influenced to the defendant's detriment, we are compelled to conclude that the integrity of the trial was undermined: under such circumstances, we cannot conclude that the jury was impartial." (*People* v. *Marshall, supra,* 50 Cal.3d at p. 951; accord, *People* v. *Holloway, supra,* 50 Cal.3d at pp. 1109-1110.)

To emphasize: the substantial likelihood of impermissible influence is satisfied if even a single juror is affected, though the rest are not.

Under article I, section 16 of the California Constitution, as we declared in *Holloway,* a criminal defendant has a right "to be tried by 12, not 11, impartial and unprejudiced jurors. 'Because a defendant charged with crime has a right to the unanimous verdict of 12 impartial jurors (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 265-266 [148 Cal.Rptr. 890, 583 P.2d 748]), it is settled that a conviction cannot stand if even a single juror has been improperly influenced.' " (*People* v. *Holloway, supra,* 50 Cal.3d at p. 1112.) "A strict rule that one tainted juror compels reversal [or vacation] is necessary in criminal cases because under the California Constitution, the jury must unanimously agree that a defendant is guilty. [Citations.] The vote of one tainted juror obviously renders the required unanimous verdict unreliable." (*Glage* v. *Hawes Firearms Co.* (1990) 226 Cal.App.3d 314, 322 [276 Cal.Rptr. 430], fn. omitted.)

Under the United States Constitution, the law is similar.

Pursuant to the Sixth Amendment as applied to the states through the Fourteenth Amendment's due process clause, a criminal defendant in a state trial such as Carpenter's has a right to trial by jury. (*Duncan* v. *Louisiana* (1968) 391 U.S. 145, 147-158 [20 L.Ed.2d 491, 495-501, 88 S.Ct. 1444].)

It is true that, under the Sixth Amendment, the defendant does not have a right to a unanimous verdict (*Apodaca* v. *Oregon* (1972) 406 U.S. 404, 410-412 [32 L.Ed.2d 184, 191-192, 92 S.Ct. 1628] (plur. opn. by White, J.); *id.* at p. 414 (conc. opn. of Powell, J.) from a jury consisting of 12 persons (*Williams* v. *Florida* (1970) 399 U.S. 78, 86-103 [26 L.Ed.2d 446, 452-462, 90 S.Ct. 1893]). It is also true that, under the same amendment, the defendant does not have a right to trial by jury *at all* when the determination goes to issues other than guilt, including penalty. (*Spaziano* v. *Florida* (1984) 468 U.S. 447, 457-465 [82 L.Ed.2d 340, 350-356, 104 S.Ct. 3154].)

Nevertheless, under both the Sixth Amendment and the Fourteenth Amendment's due process clause, the defendant does indeed have a right to an impartial jury on the issue of guilt. (*Ristaino* v. *Ross* (1976) 424 U.S. 589, 595, fn. 6 [47 L.Ed.2d 258, 263-264, 96 S.Ct. 1017]; see *Morgan* v. *Illinois* (1992) 504 U.S. 719, 725-728 [119 L.Ed.2d 492, 500-502, 112 S.Ct. 2222, 2228-2229].) Under the Fourteenth Amendment's due process clause, the defendant also has a right to an impartial jury *on any issue*, including penalty, if in fact he is tried by a jury thereon. (*Morgan* v. *Illinois, supra*, 504 U.S. at pp. 725-728 [119 L.Ed.2d at pp. 500-502, 112 S.Ct. at pp. 2228-2229].)

If even one juror is not impartial, that juror's participation renders any guilt determination invalid apparently under the Sixth Amendment and surely under the Fourteenth Amendment's due process clause. (*Irvin* v. *Dowd* (1961) 366 U.S. 717, 722 [6 L.Ed.2d 751, 755-756, 81 S.Ct. 1639].) Such a juror's participation renders any penalty determination invalid under the latter federal constitutional provision. (*Morgan* v. *Illinois, supra*, 504 U.S. at pp. 727-728 [119 L.Ed.2d at p. 502, 112 S.Ct. at pp. 2229-2230].) Invalidation is generally required under the Fourteenth Amendment's due process clause because a juror's "verdict must be based upon the evidence developed at the trial. [Citation.] This is true, regardless of the heinousness of the crime charged" or "the apparent guilt" or blameworthiness "of the offender." (*Irvin* v. *Dowd, supra*, 366 U.S. at p. 722 [6 L.Ed.2d at p. 755]; accord, *Morgan* v. *Illinois, supra*, 504 U.S. at pp. 725-726 [119 L.Ed.2d at pp. 500-501, 112 S.Ct. at p. 2228].)

In this proceeding, Judge Hoffman asked whether Juror Durham's misconduct in receiving information outside of court relating to Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences was prejudicial. He answered in the affirmative. He determined that the misconduct raised a presumption of prejudice. He then determined that, in spite of the Director of Corrections' efforts, the presumption stood unrebutted. He was correct.

To begin with, Judge Hoffman was sound in determining that juror misconduct raises a presumption of prejudice. He could not have done otherwise. That is simply the law.

Further, Judge Hoffman was sound in determining that, in spite of the Director of Corrections' efforts, the presumption stood unrebutted.

In making his determination on prejudice, Judge Hoffman, unsurprisingly, followed *Martinez*, which had already been decided, and not *Marshall*, *Holloway*, and *Hitchings*, which had not. Under *Martinez*, he was required to

ask whether, as a result of the receipt of extrajudicial information, the jury's impartiality had been adversely affected, the prosecution's burden of proof had been lightened, or the defendant's defense had been contradicted. Under *Marshall*, *Holloway*, and *Hitchings*, he would have been required to ask whether, as a result of the receipt of extrajudicial information, there was a substantial likelihood that at least one juror was impermissibly influenced.

By following *Martinez* and not *Marshall*, *Holloway*, and *Hitchings*, Judge Hoffman did not undermine his reasoning or skew his results—at least not to the harm of the Director of Corrections. The scope of *Martinez* is substantially the same as that of *Marshall*, *Holloway*, and *Hitchings*. True, there is a difference in language: the *Martinez* court spoke more specifically and we spoke more generally. But that difference is of no consequence for purposes here. In addition, the standard of *Martinez* is substantially the same as that of *Marshall*, *Holloway*, and *Hitchings*. Here too, there is a difference in language: apparently, the *Martinez* court spoke more in terms of actuality and we spoke more in terms of probability. If anything, this difference may support the proposition that the *Martinez* court set a *higher* threshold for relief than we subsequently did in *Marshall*, *Holloway*, and *Hitchings*. *Marshall*, *Holloway*, and *Hitchings* require injury to the defendant only as a *substantial likelihood*. *Martinez*, by contrast, may be read to require such injury as an *actual fact*.

Judge Hoffman was correct in finding that Juror Durham's impartiality had been "adversely affected," within the meaning of *Martinez*, by her receipt of extrajudicial information about Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences—that is to say, that she had not been impartial. In his own words: "I definitely believe it affects her impartiality."

A finding like Judge Hoffman's on the impartiality of a juror is reviewed under the deferential substantial-evidence standard. (See, e.g., *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1262 [270 Cal.Rptr. 451, 792 P.2d 251]; see also *People* v. *Zapien* (1993) 4 Cal.4th 929, 993-997 [17 Cal.Rptr.2d 122, 846 P.2d 704] [effectively implying as much]; cf. 2 Childress & Davis, Federal Standards of Review (2d ed. 1992) § 12.06, pp. 12-42-12-43 [stating that "the trial court's determination as to jury bias or impartiality" is a "pure fact question[]" and, as such, is "reviewable under the clearly erroneous standard"].) The reason for deference is based, in part, on the fact that a finding on impartiality depends on a finding as to state of mind, and a finding as to state of mind depends in turn on a finding as to "demeanor and credibility," which "are peculiarly within a trial judge's province." (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 428 [83 L.Ed.2d 841, 854, 105 S.Ct.

844]; see, e.g., *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1175 [9 Cal.Rptr.2d 834, 832 P.2d 146] [stating that, generally, the "trial judge is in the best position to assess the state of mind of a juror"].)

Judge Hoffman's finding that Juror Durham's impartiality had been adversely affected—that she had not been impartial—is supported by more than substantial evidence. Such evidence includes: the nature of the information she had received outside of court relating to Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences; the circumstances surrounding its receipt; her statement to the effect that "We are not supposed to know this, but Carpenter has already been convicted and sentenced to death for the Santa Cruz 'Trailside Murders' "—which revealed both knowledge of the forbidden information and knowledge of the fact that it was forbidden; her immediate and deliberate attempt to cover up her misconduct by canceling her newspaper subscription, and her immediate and manifest consciousness of guilt; her observed attitudes and actions during the Marin "Trailside Murder" trial, as seen from the perspective of the evidentiary hearing; her false declaration about the newspaper subscription cancellation; her demeanor at the evidentiary hearing; and her perjury on the witness stand during its course.

Judge Hoffman was also sound in determining that the People's burden of proof had been "lightened," within the meaning of *Martinez*, by Juror Durham's receipt of extrajudicial information about Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences. This conclusion follows from his finding that she had not been impartial. The People's burden of proof had been "lightened" insofar as she was concerned because she had herself found all or at least part of the requisite "proof" in the information in question.

Finally, Judge Hoffman was sound in determining that Carpenter's defense had been "contradicted," within the meaning of *Martinez*, by Juror Durham's receipt of extrajudicial information about his Santa Cruz "Trailside Murder" convictions and death sentences. This conclusion too follows from his finding that she had not been impartial. Carpenter's defense in both guilt and penalty phases that he was not the "Trailside Murderer" had been "contradicted" by the very information she had received.

From the foregoing it follows, a fortiori, that there is at least a substantial *likelihood* that Juror Durham was impermissibly influenced by her receipt of extrajudicial information about Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences. That is because Judge Hoffman correctly found that she had, *in fact*, not been impartial.

It goes without saying that, as Judge Hoffman concluded, harmless-error analysis may not be invoked in an effort to salvage the challenged judgment.

Under the United States Constitution, harmless-error analysis "presupposes," inter alia, "a trial . . . at which the defendant . . . may present evidence and argument before an *impartial . . .* jury." (*Rose* v. *Clark* (1986) 478 U.S. 570, 578 [92 L.Ed.2d 460, 470, 106 S.Ct. 3101], italics added.) The same is true under the California Constitution. (See *People* v. *Cahill* (1993) 5 Cal.4th 478, 501-502 [20 Cal.Rptr.2d 582, 853 P.2d 1037].)

Thus, when, as here, the jury was not impartial because one of its members was wanting in that regard, a necessary "presupposition" of harmless-error analysis is lacking. Consequently, such analysis is unavailable. For the absence of jury impartiality is a defect that "require[s] reversal [or vacation] without regard to the evidence in the particular case." (*Rose* v. *Clark, supra*, 478 U.S. at p. 577 [92 L.Ed.2d at p. 470] [under U.S. Const., Amend. XIV, § 1 ("due process of law" guaranty)]; see *People* v. *Cahill, supra*, 5 Cal.4th at pp. 501-502 [under Cal. Const., art. VI, § 13].) Surely, the absence of jury impartiality is not an ordinary " 'trial error.' " (*Arizona* v. *Fulminante* (1991) 499 U.S. 279, 307 [113 L.Ed.2d 302, 330, 111 S.Ct. 1246].) Rather, it is a "structural defect[] in the constitution of the trial mechanism, which def[ies] analysis by 'harmless-error' standards." (*Id.* at p. 309 [113 L.Ed.2d at p. 331].) The matter is settled. (*Johnson* v. *Armontrout* (8th Cir. 1992) 961 F.2d 748, 756.)

Therefore, under the Constitutions of both the United States and California—and without regard to *Martinez*, on the one side, and *Marshall, Holloway*, and *Hitchings*, on the other—Judge Hoffman's correct finding that Juror Durham had, in fact, not been impartial *compels* the conclusion that the challenged judgment must be vacated.

## IV

As they commence their analysis, the majority present certain decisions of the United States Supreme Court as though they stated the "applicable law" (maj. opn., *ante*, at p. 647, initial capitalization and boldface omitted)—which, in fact, they do not.[7] The snippets of language they gather together, however, do betray the "pragmatic approach" they follow (maj. opn., *ante*, at

---

[7]Thus, *Smith* v. *Phillips* (1982) 455 U.S. 209 [71 L.Ed.2d 78, 102 S.Ct. 940] teaches that juror bias should not be implied by law in a federal habeas court, *not* that it may not be found in fact by a state trial court—as is the case here. *Rushen* v. *Spain* (1983) 464 U.S. 114 [78 L.Ed.2d 267, 104 S.Ct. 453] is to the same effect. Similarly, *McDonough Power Equipment, Inc.* v. *Greenwood* (1984) 464 U.S. 548 [78 L.Ed.2d 663, 104 S.Ct. 845] teaches that, in a federal civil action, juror bias should not be implied by law but may be found in fact. *Romano*

p. 648: to ignore the factual findings—supported by substantial evidence —of a respected and thoughtful superior court judge and thereby uphold a verdict poisoned by serious juror misconduct.

In a crucial point, the majority deny that Judge Hoffman found that Juror Durham had not been impartial. To be sure, he did not declare, in these very words, that "Juror Durham had not been impartial." But what else could he have meant when he made the statements quoted at length above? Recall that he concluded with specific reference to the extrajudicial information Juror Durham had received about Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences: "I definitely believe it affects her impartiality." Are these the words of a man who did *not* find that she "was biased"? (Maj. opn., *ante,* at p. 655.)

That Judge Hoffman employed "would's" and "could's" and similar terms is no indication of anything other than a finding that Juror Durham had not been impartial. He was compelled to use the language of inference inasmuch as she went so far as to perjuriously deny her receipt of extrajudicial information about Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences. Since she refused to own up to her misconduct, he was forced to deduce its effect.

Further, by stating his belief, in a contrary-to-fact condition, that the challenged judgment could have been salvaged under harmless-error analysis "had this jury been completely impartial," Judge Hoffman implied that "this jury had *not* been completely impartial." Manifestly, the source of the taint was Juror Durham.

If there remains any doubt about the matter, I direct attention to the following. As noted, Judge Hoffman stated that he intended to—and did in fact—send a letter to both the Attorney General and the San Diego District Attorney requesting that each review Juror Durham's conduct "for possible criminal prosecution under Penal Code Section 96." As also noted, that provision subjects to criminal sanction any juror who "[w]*illfully and corruptly* permits any communication to be made to him, or receives any . . . information relating to any cause or matter pending before him, except according to the regular course of proceedings." (Italics added.) Such a request would be reasonable only if, as is plainly the case, Judge Hoffman had found that Juror Durham had not been impartial.

Under all that they say, the majority appear to disagree with Judge Hoffman that Juror Durham had not been impartial. This in spite of the fact

v. *Oklahoma* (1994) 512 U.S. __ [129 L.Ed.2d 1, 114 S.Ct. 2004] does not even involve juror bias at all. Contrary to the majority's implication, it manifestly does not erect an obstacle against finding bias in a juror under circumstances such as those disclosed here.

that he could, and did, take his measure of the woman as she perjured herself on the witness stand—and they cannot do so.

In part, the majority seem to say, Judge Hoffman did his job wrong: he "did not make any credibility-based finding that [Juror Durham] was biased . . . ." (Maj. opn., *ante*, at p. 655.) Perhaps not expressly. But, clearly, by implication. Recall his rhetorical question about Juror Durham and her receipt of extrajudicial information about Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences: "And then you get to the—then you get to the hearing and the confrontation, she denies it. . . . Now what inferences can you draw from the fact that when she's confronted, she denies it, as to her impartiality[?]" Evidently, he based his finding on Juror Durham's lack of impartiality, at least to some extent, on adverse inferences he drew from her perjury.

In other part, the majority seem to say, Judge Hoffman did his job with too sensitive a conscience.

The majority assert: "Many jurors, in the middle of a long and notorious trial, might, for many reasons unrelated to bias, be reluctant to go forward and actively inject themselves into the proceedings." (Maj. opn., *ante*, at p. 656.) Many jurors, perhaps. But Juror Durham? She was expressly found by Judge Hoffman to have been an "outspoken person," indeed a "very outspoken" person. Together with the other jurors, she had been admonished to come forward in the event that she should receive extrajudicial information about the case. She had evidently seen what might happen if she did: Two prospective jurors had received such information; both had come forward; and both had been excused. Whether Juror Durham intentionally suppressed her receipt of the information in question in order to remain on the jury is not clear. But what *is* clear is this: Before her service as a juror, she had been employed as a nurse working in hemodialysis. During her service, she continued to receive her full salary; she enjoyed more time at home with her family; and, to her relief, she avoided exposure to the human immunodeficiency virus (HIV), which is believed to cause acquired immunodeficiency syndrome (AIDS).

The majority also assert: Juror Durham "might not [have] attach[ed] the same importance to" extrajudicial information about Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences "as [did] the parties." (Maj. opn., *ante*, at p. 656.) Why then did she attempt to cover up her receipt of such information, immediately after she revealed her misconduct in her conversation with Lustig and Duran, in the midst of the guilt phase? She had obtained the information in question from newspaper accounts, either directly or, more likely, through her husband. She canceled her newspaper subscription *on or as of the date of the conversation in question.*

.

The majority further assert: "[T]he fact [Juror Durham] covered up *after* the verdict when she was challenged in order to protect herself . . . does not show bias *during the trial, deliberations and verdict.*" (Maj. opn., *ante*, at p. 567, italics in original.) To the extent that the majority imply that she covered up only *after* the verdict, that "fact" is no fact at all. As noted, she covered up *immediately, in the very midst of the guilt phase.* Her conduct suggests something other than strict impartiality.

The majority lastly assert: "The fact [Juror Durham] did not reveal her knowledge to the rest of the jury" "tends to negate the inference [she] was biased" and "tends to show [she] intended the forbidden information *not* to influence the verdict." (Maj. opn., *ante*, at p. 657, italics in original.) That "fact" too is no fact at all. Judge Hoffman made no finding in that regard whatsoever, either express or implied.

In addition to denying that Judge Hoffman found that Juror Durham had not been impartial, the majority assert that he ignored the record of the Marin "Trailside Murder" trial. They say that he found that the extrajudicial information about Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences "inherently prejudicial in and of itself without reference to the rest of the record. [He] stated the evidence of guilt (as well as that supporting the penalty determination) was 'overwhelming,' but felt legally precluded from considering this evidence." (Maj. opn., *ante*, at p. 655.)

Judge Hoffman *did not* find that the extrajudicial information about Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences was prejudicial either *automatically* or *in isolation.* He expressly recognized that "jury misconduct is not per se reversible . . . ." He also expressly recognized that he was required to conduct a "review of the entire record" in order to determine whether "the defendant has suffered [any] prejudice." This defeats the majority's unsupported assertion that he "felt legally precluded from considering th[e] evidence" at the Marin "Trailside Murder" trial, and found prejudice on the basis that the information in question was "inherently prejudicial in and of itself without reference to the rest of the record." (Maj. opn., *ante*, at p. 655.)

This is not to say that Judge Hoffman did not treat the extrajudicial information about Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences as "inherently prejudicial." Of course he did—essentially to distinguish this case from those in which a "presumption of prejudice has been rebutted." Rightly so. Would not *any* juror at *any* trial become less kindly disposed toward Carpenter on learning that he had been convicted of, and sentenced to death for, the Santa Cruz "Trailside Murders"? Such

information, even in the abstract, casts an unfavorable light on its subject. More significant, would not *any* juror *at the Marin "Trailside Murder" trial* become less kindly disposed toward Carpenter on learning that he had been convicted of, and sentenced to death for, the Santa Cruz "Trailside Murders"? Such information, on the particular facts of this case, would have all but answered the two ultimate questions that the juror had to address: "Is Carpenter the 'Trailside Murderer'? And, if so, what should he suffer?" Certainly, Judge Hoffman did nothing wrong in treating the information in question as "*inherently* prejudicial." Indeed, he anticipated the "substantial likelihood" test of *Marshall, Holloway,* and *Hitchings,* which turns on whether the information " 'is *inherently* likely to have influenced the juror' " (*People* v. *Marshall, supra,* 50 Cal.3d at p. 951, italics added). As he made plain, he treated the information in question as "inherently prejudicial" *because it was prejudicial within the context of the Marin "Trailside Murder" trial.* So much for the majority's unsupported assertion that he "felt legally precluded from considering this evidence." (Maj. opn., *ante,* at p. 655].)

This is also not to say that Judge Hoffman did not "feel legally precluded." He did. He "felt legally precluded"—as the majority really do not— from applying harmless-error analysis because he found that Juror Durham had not been impartial.

Under all that they say, the majority appear to disagree with Judge Hoffman that the extrajudicial information about Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences was "inherently prejudicial." How can they do so? He had reviewed the entire record of the Marin "Trailside Murder" trial. *They expressly admit that they have not.* He had presided over that trial; he constantly referred to its record in the course of this proceeding. *They have practically no acquaintance with that trial or its record.*

"[E]vidence of most of the Santa Cruz County *crimes* was presented to the jury," say the majority, although they themselves have examined none of it: "All [Juror Durham] learned out of court was the verdict of the first jury." (Maj. opn., *ante,* at p. 655, italics in original.) Is *that* "all" that she learned? That another jury had found Carpenter guilty of the Santa Cruz "Trailside Murders" and fixed the punishment at death? Is *that* "all"? Perhaps the effect of the extrajudicial information might have been reduced somewhat if it had been received by Juror Durham only *after* the cause had been submitted to the jury—that is, only *after* all the evidence had been presented and could then be considered. The information in question, however, had been received much earlier: most likely, to extrapolate from Juror Durham's cover-up, even before the commencement of the guilt phase; surely no later than the

middle of that phase, as established by the words she spoke on March 26, 1988, to the effect that "We are not supposed to know this, but Carpenter has already been convicted and sentenced to death for the Santa Cruz 'Trailside Murders.' "

The majority are right in stating that "[a] court's determination during trial that certain evidence is more prejudicial than probative, and therefore should not be admitted, is very different from a determination after trial whether the jury's acquisition of that evidence was prejudicial in light of the entire record." (Maj. opn., *ante*, at p. 655, fn. 2.) They are wrong, however, in implying that Judge Hoffman made only the first "determination" here. Prior to trial, he ruled that Carpenter's Santa Cruz "Trailside Murder" convictions and death sentences were substantially more prejudicial than probative and barred their introduction. After trial, on habeas corpus, he ruled consistently that extrajudicial information relating to those convictions and death sentences had impermissibly influenced Juror Durham: "I definitely believe it affects her impartiality." The majority, of course, are in no position to disagree. As stated, they expressly admit that they have not reviewed the entire record of the Marin "Trailside Murder" trial.

As they turn from analysis to disposition, the majority expressly admit, as they must, that they have not reviewed the entire record of the Marin "Trailside Murder" trial. Further, they expressly admit, as they must, that they need the entire record "to confidently review" the matters underlying Judge Hoffman's judgment and order. (Maj. opn., *ante*, at p. 659.)

What follows from these facts?

Under the rule of appellate procedure that is generally applicable, an appellant's appeal must fail for want of an adequate record and, accordingly, the judgment or order appealed from must be affirmed. (E.g., *Scala v. Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 367, fn. 4 [90 Cal.Rptr. 592, 475 P.2d 864].) That means, of course, the Director of Corrections' challenge must be rejected and, as a result, Judge Hoffman's decision must be upheld. Such an outcome is practically compelled under the facts of this case: the Director of Corrections' sole argument against Judge Hoffman's conclusion that Juror Durham's misconduct was prejudicial is predicated on the assertedly "overwhelming evidence" that the *absent* record of the Marin "Trailside Murder" trial sets out. The foregoing rule of appellate procedure has special applicability here: Juror Durham committed misconduct. That is undisputed and indisputable. Her misconduct raises a presumption of prejudice. That too is undisputed and indisputable. If, then, as the majority assert, "[w]e cannot now . . . decide whether Carpenter was prejudiced" (maj. opn., *ante*, at p.

659), *we must therefore conclude that the presumption of prejudice has not been rebutted and proceed to affirm Judge Hoffman's judgment and order.*

There is, however, no need to rely on a "mere" rule of appellate procedure when a principle of greater force and dignity lies at hand.

Section 13 of article VI of the California Constitution declares: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

The majority altogether ignore the constitutional provision. They effectively admit that they have not conducted an "examination of the entire cause, including the evidence," but nevertheless go on to "set aside" Judge Hoffman's judgment and order. Certainly, they cannot even claim to discern a "miscarriage of justice" since they state that they "cannot now . . . decide whether Carpenter was prejudiced." (Maj. opn., *ante,* at p. 659.) Their implication that Judge Hoffman's "error" is "prejudicial" because the subsequent judgment and order are adverse to the Director of Corrections merely begs the question. Otherwise, any error would be "prejudicial" per se because any subsequent judgment or order is necessarily adverse to the losing party. Obviously, Judge Hoffman's "error" could have prejudiced the Director of Corrections *if and only if* Juror Durham's misconduct did not in fact prejudice Carpenter. But the majority state that they cannot now determine whether that condition was satisfied.

Even less persuasive than other aspects of the majority's discussion is the reason they give for refusing to follow the ordinary course taken by reviewing courts in circumstances such as assertedly obtain here—that is, vacate the judgment and order, which were rendered under *Martinez,* and remand the cause with directions to reconsider the matter in light of *Marshall, Holloway,* and *Hitchings,* which have superseded *Martinez.* The majority say that "little would be gained by a remand." (Maj. opn., *ante,* at p. 658.) Not so. Much would be gained. But none of it to their liking. For it is practically a foregone conclusion that, if Judge Hoffman were to reconsider the matter in light of *Marshall, Holloway,* and *Hitchings,* he would find himself compelled to reinstate his judgment and order. As explained, if anything, the *Martinez* court set a *higher* threshold for relief than we subsequently did in *Marshall, Holloway,* and *Hitchings. Marshall, Holloway,* and *Hitchings* require injury to the defendant only as a *substantial likelihood. Martinez,* by

contrast, may be read to require such injury as an *actual fact*. Recall that Judge Hoffman found—correctly—that Juror Durham had, *in fact*, not been impartial. It follows, a fortiori, that there is at least a substantial *likelihood* that she was impermissibly influenced.

Although the majority give a reason for refusing to remand, they give none at all for declining to vacate submission of the cause in this court and await receipt of the record of the Marin Trailside Murder" trial, which is now due. They give no reason because there is none: the merits of their approach may be determined by the absence of any rationale.

In conclusion, as the author of the majority opinion himself recently declared: " '[T]here is no judge better suited for making a determination of the issues raised in petitioner's petition than the original trial judge.' " (*People* v. *Duvall* (1995) 9 Cal.4th 464, 491 [37 Cal.Rptr.2d 259, 886 P.2d 1252] (conc. & dis. opn. of Arabian, J.).) In this proceeding, that judge is Judge Hoffman. His decision should not be disturbed.[8]

V

For the reasons stated above, I would affirm Judge Hoffman's judgment and order.

Lucas, C. J., and Kennard, J., concurred.

Petitioner's application for a rehearing was denied May 17, 1995. Lucas, C. J., Mosk, J., and Kennard, J., were of the opinion that the application should be granted.

---

[8]I note, in passing, that Carpenter is not compelled to accept the majority's invitation to file a habeas corpus petition realleging Juror Durham's prejudicial misconduct *in this court*. Since there has been a "change in the applicable law" (*In re Clark* (1993) 5 Cal.4th 750, 767 [21 Cal.Rptr.2d 509, 855 P.2d 729]) as *Marshall, Holloway*, and *Hitchings* have superseded *Martinez*, he may, apparently, file such a petition in the San Diego Superior Court—whose subject matter jurisdiction under section 10 of article VI of the California Constitution even the majority must recognize. Judge Hoffman has certainly shown himself to be faithful to the law and careful with the facts. He is thoroughly familiar with all the issues material here. It goes without saying that Carpenter may also file a petition in the United States District Court for the Southern District of California.