BAXTER, J.
I respectfully dissent. In 1988 or 1989, defendant’s young son told her the victim, Daniel Driver, had molested him. Driver remained at large until 1993, while defendant’s son developed serious psychological problems as a result of the sexual assault. Defendant’s long-smoldering anger was rekindled when Driver, finally arriving in court to face molestation charges, smirked at defendant and her son. She lunged at Driver, but her sister held her back. Later, during a break in the court hearing, defendant exacted her final revenge. Using a pistol she had taken from her sister’s purse, she fired five shots into the back of Driver’s head at point-blank range and in full public view.
In an emotional but lucid statement to the police, defendant expressed moral ambivalence about her act. She said Driver was “sick” and deserved to die for the pain he had caused, but she also declared she had not planned to kill, wondered aloud if her act meant she herself was “sick," and claimed she had told her son she belonged in jail because what she had done was wrong. Defendant also admitted using “crank” (i.e., methamphetamine) on the morning of the homicide, but she said she did not use it all the time. A blood test showed methamphetamine levels consistent with substantial use over several days.
Charged with a sensational murder in a rural community, defendant requested no change of venue. Her choice was calculated to exploit the considerable local sympathy for her situation. On the other hand, a hometown trial entailed the strong chance that jurors would hear gossip about the case and about defendant herself.[1]
Nonetheless, defendant’s preference for a local trial bore fruit. Despite overwhelming evidence that she had carried out a “vigilante” execution, the *594 jury acquitted her of murder and convicted her only of voluntary manslaughter, apparently under instructions presenting the theory of “heat of passion” negating malice.[2]
Not content, defendant sought a further finding of not guilty by reason of insanity. In a separate trial, various expert witnesses debated at length defendant’s mental state at the time of the homicide. Though there was a consensus that defendant had a grandiose, emotional, narcissistic, impulsive, and aggressive personality, prosecution experts uniformly concluded she exhibited no mental condition that would have prevented her from knowing her act was wrong.
One defense expert, Dr. Philip Trompetter, suggested in the course of his extensive testimony that defendant had a hypervigilant attitude toward her children, as illustrated by the fact that she usually refused to employ babysitters. Dr. Trompetter also said defendant reported using methamphetamine “15 or 20 times” in the year before the homicide, and Dr. Trompetter himself had received information about defendant’s use of drugs in 1989.
In Dr. Trompetter’s opinion, defendant’s degree of use would influence the extent to which the drug might have impaired her mental condition at the time she killed the victim. A prosecution psychopharmacologist testified that defendant’s behavior on the day of the homicide seemed less influenced by her blood-amphetamine level than he would expect in an inexperienced user. With the exception of Dr. Trompetter, no expert witness attached significant importance to drugs as a factor in defendant’s mental condition when she killed the victim. In a verdict which found ample support in the evidence, the jury unanimously found that defendant was sane at the time of the homicide.
Later it came to light that during the sanity trial, Juror Katherine Elizabeth Boje, while passing time in a local bar, had overheard some unfavorable *595 comments about defendant by a woman who claimed to know her. Boje did not report the incident to the trial court, but several times during the jury’s sanity phase deliberations, she interjected the information she had overheard.
The trial court conducted a careful investigation, took evidence, made detailed findings of fact, and determined that while Boje had committed “misconduct,” no prejudice warranting a new trial had resulted. After further careful analysis, the Court of Appeal agreed. However, the instant lead and concurring opinions hold otherwise. Because they conclude we must find a substantial likelihood of juror bias arising from this incident, they overturn the trial court’s denial of defendant’s motion for a new sanity trial. I cannot agree.
Both the lead opinion and the concurrence purport to apply principles we recently articulated in In re Carpenter (1995) 9 Cal.4th 634 [38 Cal.Rptr.2d 665, 889 P.2d 985] (Carpenter). There we held that when a verdict already rendered is challenged because one or more jurors received information from outside sources, the judgment must be reversed if, but only if, there appears a substantial likelihood of juror bias. (Id. at p. 653.)
Under Carpenter, such bias is either “inherent” or “actual.” “Inherent” bias must be found if the outside information was significant enough that its improper introduction in the trial itself would have required reversal by normal appellate standards of “prejudicial error.” (Carpenter, supra, 9 Cal.4th at pp. 653-654.) Even when no inference of “inherent” bias thus arises, reversal is still necessary if the “totality of the circumstances” indicate an objective likelihood that one or more jurors was “actually” biased by the information. (Id. at p. 654.)
For purposes pertinent here, the trial court, after resolving credibility issues, made the following findings of chronological fact: Juror Boje had no pretrial bias or prejudice which she concealed during voir dire. However, while Boje was in a bar during the sanity trial, she overheard another woman, whom she did not know, claim to have been a babysitter for defendant’s children. The woman stated that defendant left her children for long periods, was not a good mother, and used drugs.
The trial court further found as follows: During subsequent sanity deliberations, Boje told fellow jurors she herself knew defendant’s babysitter. Boje also implied she had information about defendant, her family, and her associates, that other jurors did not have. In the course of deliberations, Boje referred to defendant as a “crankster” who used methamphetamine more than the evidence showed. Boje made these comments, either out loud or under *596 her breath, at times when she disagreed with views expressed by other panelists.[3]
Defendant does not press in this court any claim that Boje harbored or concealed any pretrial bias. The sole issue is therefore the effect of the outside information to which Boje was exposed during the sanity trial. Moreover, defendant does not contend this information was significant enough to produce “inherent” bias in any juror, and the lead and concurring opinions wisely place no reliance on any such theory. Finally, neither defendant, the lead opinion, nor the concurrence suggests that any juror other than Boje was “actually” biased by exposure to the information. Instead, the lead and concurring opinions rely solely on their acceptance of defendant’s argument that Boje herself must be considered “actually” biased as a result of the information she received.
The lead opinion focuses almost exclusively, and the concurrence primarily, on Boje’s behavior during the deliberations themselves. The salient fact emphasized is that Boje mentioned the outside information on a number of occasions when she disagreed with other jurors’ views. The lead opinion’s reasoning on the point is particularly simplistic. That reasoning starts and stops with the premise that if Boje had not been influenced by what she overheard, she would not have attempted to use it as a basis for swaying other jurors.
But in order to assess, in a post-trial context, whether it is “substantially] ” likely a juror became “actually” biased by receiving outside information that could not have produced “inherent” bias, we must examine “the ‘entire record’ logically bearing on [such a] finding . . . .” (Carpenter, supra, 9 Cal.4th at p. 654, italics added.) The pertinent “record” includes not only “the nature of the juror’s conduct [in relation to the extraneous information],” but also “the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant.” (Ibid.)
Moreover, the examination must be practical and not hypertechnical, conducted with the understanding that “[j]urors are not automatons[, but] are *597 imbued with human frailties” which inhere in the jury system. (Carpenter, supra, 9 Cal.4th at pp. 654-655.) “If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every juror during the course of trial is unrealistic” (id. at p. 655), and few verdicts would survive scrutiny under such a standard (see People v. Marshall (1990) 50 Cal.3d 907, 950 [269 Cal.Rptr. 269, 790 P.2d 676]). “[T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection.” (Carpenter, supra, 9 Cal.4th at p. 654.)
With these principles in mind, and after considering Juror Boje’s conduct in the context of the “entire record,” I conclude that the motion for a new trial was properly denied. In my view, the record fails to show an objective and “substantial” likelihood that the information Boje overheard actually influenced this juror’s vote or affected her ability and intention to decide the issue of defendant’s sanity solely on the evidence, as she had sworn to do.
First, the circumstances under which Boje was exposed to the outside information belie any “substantial” probability of “actual” bias. Boje herself engaged in no outside conversation about the case contrary to admonition. Instead, she simply overheard snippets of information in a bar. (Cf. Carpenter, supra, 9 Cal.4th at p. 656 [juror’s initiation of conversation with friends about information she wrongly learned from newspapers creates no necessary inference of bias].) Boje’s exposure to this information occurred while she was pursuing a normal activity permitted an unsequestered juror, in a small community where rumors and gossip about defendant’s high-profile case were certain to be in widespread circulation.
Even if Boje’s inadvertent receipt of outside information may technically be deemed “misconduct,” any strong inference of bias is dispelled by the “passive” nature of the impropriety. (Carpenter, supra, 9 Cal.4th at p. 656.) Moreover, the fact that the information came from a stranger overheard in a bar undermines any objective deduction that Boje gave the information serious independent credence.
Boje also committed “misconduct” by failing to report her exposure to the trial court. However, as we indicated in Carpenter, a juror’s improper failure to make such a report is not a substantial indicator that she was biased by the outside information. Failure to report is also a “passive” form of misconduct, and it is understandable in human terms. “Many jurors, in the middle of a long and notorious trial, might, for many reasons unrelated to bias, be reluctant to go forward and actively inject themselves into the proceedings.” (Carpenter, supra, 9 Cal.4th at p. 656.)
*598 Moreover, though the lead opinion implies otherwise, when the information Boje overheard is viewed against the entire record, there appears no objective likelihood, “substantial” in degree, that she was swayed from exclusive reliance on the trial evidence. The snippets of gossip Boje overheard in one casual barroom conversation hardly compared with the wealth of evidence introduced in the guilt and sanity trials themselves about the circumstances of defendant’s crime, her background, her lifestyle, her parental feelings, and her mental state in general. Indeed, as both courts below emphasized, the gossip about defendant’s drug use substantially coincided with evidence on that issue that was introduced at the sanity phase, largely at defendant’s behest. The bar patron’s assertion that defendant “was not a good mother” and left her children for long periods did tend to contradict one aspect of Dr. Trompetter’s sanity phase analysis of defendant’s personality. However, as the trial court indicated, this was a “remote” issue in the overall presentations of the sanity phase experts from both sides.
It is true that Boje improperly mentioned the outside information on several occasions during deliberations. (See Carpenter, supra, 9 Cal.4th at p. 656 [willingness to “us[e] the forbidden information” as bearing on bias].) However, that circumstance alone is not dispositive on the issue of “actual” bias. If it were, the interjection of outside information into deliberations would always require invalidation of the jury’s verdict. Obviously this cannot be, and is not, the law. (See, e.g., People v. Marshall, supra, 50 Cal.3d 907, 949-952.)
Here, there is no finding that Juror Boje said she would allow the outside information to influence her own verdict. (See Carpenter, supra, 9 Cal.4th at p. 656.)[4] And since all other aspects of the “entire record” make it appear so objectively unlikely that Boje was swayed by the gossip she overheard, the most plausible inference is that any adverse attitudes she came to harbor toward defendant’s claim of insanity must, like those of the other 11 jurors, have arisen from the evidence produced at the guilt and sanity trials. Even if she sought to influence other jurors with what she had heard outside the courtroom, or simply used this means to express her frustration with the *599 progress of deliberations, her behavior does not establish her own “actual” bias arising from the outside information.[5]
The lead and concurring opinions reflect the very “quest [for] an ever-elusive perfection” we so recently condemned in Carpenter, supra, 9 Cal.4th at page 654. Moreover, they do so in a case where such a quest is particularly inappropriate. When defendant accepted a jury of her neighbors, including Juror Boje, she entrusted her fate not to “automatons,” but to human beings and their frailties, with all the benefits and burdens that choice entailed. In the highly charged local atmosphere this case produced, it would have been almost impossible to protect defendant’s unsequestered jury from any and all exposure to outside rumor, gossip, and discussion. That Juror Boje was so exposed, without any effort on her part, is unremarkable in the extreme. That she spoke of what she heard in the jury room is unfortunate, but short of a showing of “actual” bias, it was a human mistake of the kind we must be prepared to accept as the price of our precious jury system. I find no “substantial” likelihood that such “actual” bias occurred here. I would affirm the judgment of the Court of Appeal.
Chin, J., and Brown, J., concurred.

The irony in defendant’s current claims of juror taint is heightened by record indications that she and her counsel sought to take maximum advantage of her ties to the local community. Indeed, the record strongly suggests her strategists sought to gamble on a complete acquittal, against the evidence and instructions, through the “nullification” powers of a sympathetic local jury. At the outset, the prosecution felt compelled to take the unusual step of obtaining an antipublicity order to prevent pollution of the jury pool by the defense. Moreover, the trial court was obliged to overrule vigorous defense objections to its sua sponte instruction on voluntary manslaughter, based on heat of passion, as a lesser included offense of murder. As counsel candidly explained in the words of an old song, the defense took the tactical view that the case should be tried on the basis of “all or nothing at all.” On appeal, defendant persisted in her objection to the heat of passion instruction, urging that the evidence did not support this theory because she had enough time to “cool down” after the victim’s most recent provocation. Thus, even prior to the sanity phase, the defense sought to put the jury to a difficult choice: either convict a neighbor of the most serious form of criminal homicide—murder—for killing her child’s molester, or absolve her of all criminal liability.

To support their conclusions, the lead opinion presents a richer and more lurid version of the events involving Juror Boje. In doing so, however, they violate their own purported deference to the trial court’s credibility determinations and findings of historical fact. The lead opinion improperly resolves, in the manner most favorable to their conclusions, disputed factual nuances that were not addressed or determined by the trial court. For example, the lead opinion relies solely on the disputed testimony of individual jurors to state as “fact” that Boje’s comments came at specific moments when the jurors were discussing trial evidence about defendant’s maternal attitudes and drug use, that Boje was warned by other jurors not to discuss information from extraneous sources, and that Boje herself acknowledged she was wrong to do so. The trial court never made any such findings. I cannot support the lead opinion’s attempt to recast and reweigh the evidence.

The trial court found Juror Boje commented that defendant used drugs “more than the evidence showed,” but given the tangential relevance of such information, and the fact that if anything, it tended to support, rather than undermine, the defense theory of insanity, this comment indicates no objective likelihood of adverse bias. According to the testimony of Juror Ulvevadet, Boje said that “if we knew what she knew then we would know different.” But the trial court did not specifically credit this portion of Ulvevadet’s testimony. I therefore conclude it can form no basis for a conclusion that Boje was “actually” biased. More fundamentally, any such comment by Boje is inadmissible to demonstrate her bias, since it involves a direct intrusion into her internal deliberative processes. (Evid. Code, § 1150, subd. (a).)

The concurring opinion concedes, at least, that Boje’s conduct does not compel an inference of “actual” bias and, indeed, permits no clear conclusion on that question. However, the concurrence reasons, because the issue is in “equipoise” on the evidence, the “presumption of prejudice” traditionally applicable to prior misconduct “stands unrebutted.” (Conc, opn., ante, at p. 593.) I disagree. The “presumption of prejudice” may be rebutted by the reviewing court’s determination, after it has reviewed the “entire record,” that there is no “reasonable probability” or “substantial likelihood” of actual bias. (Carpenter, supra, 9 Cal.4th 634, 653; In re Hitchings (1993) 6 Cal.4th 97, 119 [24 Cal.Rptr.2d 74, 860 P.2d 466]; People v. Miranda (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127]; Hasson v. Ford Motor Co. (1982) 32 Cal.3d 388, 417 [185 Cal.Rptr. 654, 650 P.2d 1171].) For the reasons expressed elsewhere in this opinion, I conclude the “entire record" in this case raises no such “reasonable probability” or “substantial likelihood.”